IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **DAVID JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| v. | ) | |
| | ) | **2:09-cv-924-MEF-SRW** |
| **THE ADVERTISER COMPANY, INC.,** | ) | |
| **d/b/a THE MONTGOMERY** | ) | |
| **ADVERTISER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT THE ADVERTISER COMPANY'S
## BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Plaintiff David Johnson ("Johnson" or "the plaintiff"), worked for The Advertiser Company, d/b/a The Montgomery Advertiser ("the Advertiser") as a Sports Editor.  As a result of Johnson's repeated performance problems in that role, he was placed on a Performance Improvement Plan ("PIP"), which he considered a "joke."  Johnson admitted that he made no effort to improve during the PIP and did not listen to the counseling provided by his supervisor.  His utter disregard for the PIP process resulted in no marked improvement in his performance, and, consequently, the Advertiser terminated Johnson's employment.  Johnson now asserts that his termination violated the Fair Labor Standards Act ("FLSA") and

was in retaliation for alleged complaints that the sports reporters working for him underreported their working hours and were not paid overtime. Johnson's claim fails because his termination was entirely unrelated to his alleged complaints and was instead based on his well-documented, persistent performance problems.

## II.    STATEMENT OF FACTS

### A.    Defendant The Montgomery Advertiser

The Advertiser is a newspaper published in Montgomery, Alabama, for the population of Montgomery and its outlying areas. (Gray Decl. 1).[1] In recent years, the Advertiser, like many other newspapers, has experienced financial strain and layoffs. (Gray Decl. 1). The company has made significant efforts to limit the number of layoffs necessary, including cutting budget items in other areas. (Gray Decl. 1-2). Because overtime is expensive and can be controlled, the Advertiser instructed its employees to seek pre-approval of overtime so that management could determine whether the overtime sought was really necessary. (Gray Decl. 2).

### B.    Johnson's Employment with The Montgomery Advertiser

In 2006, Advertiser Executive Editor Wanda Lloyd interviewed Johnson for the then-available Assistant Sports Editor position at the paper. (Lloyd 27). Johnson also interviewed with then-Publisher Scott Brown and then-Sports Editor

---

[1] Citations to depositions are referenced as (Deponent Page Number/Exhibit Number). Citations to declarations are referenced as (Declarant Decl. Page Number).

Ben Thomas. (Lloyd 28). On May 30, 2006, Lloyd hired Johnson as the Assistant Sports Editor. (Johnson 139-141; Lloyd 28; Brown 17).

In 2007, the Advertiser transitioned from a traditional newsroom to a Local Information Center (the "LIC") format, which focused the paper's coverage on the local community. (Gray 63-64; Brown 19-20). As part of the transition to the LIC, the Advertiser reassigned its Assistant Editors, including Johnson, who became a part of the Community Conversations desk.[2] (Johnson 166; Gray 63-64). Approximately one month after Johnson's reassignment, Sports Editor Thomas left his employment with the Advertiser; in April of 2007 Lloyd, Managing Editor Mel Gray, and Brown promoted Johnson to Sports Editor. (Lloyd 31; Johnson 169; Brown 25-26).

As Sports Editor, Johnson's job duties included planning coverage for the Sports Section, participating in daily line editing, guiding staff members working with other editors to produce the paper and attending daily news meetings and providing daily budgets. (Johnson Ex. 25). Scheduling and time management were critical functions of his job. (Johnson Ex. 25; Gray Decl. 2) Specifically, he was responsible for: selecting stories to plan coverage for the Sports Section and assigning stories to his reporters; utilizing his resources efficiently, including prioritizing stories and deciding whether to use the Associated Press wire instead

---

[2] Community Conversations includes the Opinion and Editorial sections of the paper.

of assigning reporters to cover certain stories; communicating with other departments to coordinate video or photographic coverage for sports stories; and communicating with his staff regarding their assignments and with his supervisors about his planned coverage. (Johnson Ex. 25; Gray Decl. 2)  As Sports Editor, Johnson reported directly to Local Editor Gary Maitland, who reported to Gray, who in turn reported to Lloyd. (Johnson 191-92). Brown, as the President and Publisher, oversaw the entire paper. (Brown 15).

### C.    Johnson's Performance Problems

In his role as Sports Editor, Johnson had significant and repeated performance problems. In May of 2007, Johnson received his annual performance appraisal, which covered his jobs as Assistant Sports Editor, Community Conversations participant, and Sports Editor, all positions he had held within the prior year.   The annual appraisal listed a number of areas for improvement: Communication; Supervisory Skills, Control and Interpersonal Skills; Leadership; Job Knowledge; Planning; and Teamwork.   (Johnson Ex. 7).   As part of the appraisal, Johnson was instructed to develop a consistent routine for inner-office communications, including daily budgets and brief weekly meetings with the Local Editor. (Johnson Ex. 7). The 2007 performance appraisal further said that Johnson needed to improve his interpersonal skills with co-workers and customers, noting that "[Johnson] must always be cognizant of the importance of good customer

relations." (Johnson Ex. 7).  In his self-appraisal, Johnson acknowledged some of his shortcomings, stating, "[t]he biggest challenge is time management, particularly with regard to planning." (Johnson Ex. 8, ID 00193).    Johnson's supervisors, Gray and Lloyd, worked with Johnson to help him improve his planning and communication, and Gray asked for his reporters' schedules so that she could help him prioritize coverage and keep the reporters' schedules manageable.  (Gray 81-85).  Johnson resisted assistance and never gave her the requested schedules.  (Gray 85).

In July of 2007, after ninety days in the Sports Editor position, Johnson received a 90-day performance appraisal, which addressed many of the same issues that had been raised previously: Johnson's need to improve his communication by scheduling a weekly meeting with the Local Editor to plan coverage, as well as the fact that other newsroom employees had expressed concerns about Johnson's interpersonal skills in the previous weeks.  (Johnson Ex. 9).  The appraisal further noted Johnson's confrontational behavior, stating that Johnson "must recognize this is a concern for others and work to improve in this area."  (Johnson Ex. 9).

Between performance appraisals, Johnson's poor performance continued. As part of the transition to the LIC, Lloyd and Gray directed Johnson to include more women's sports and more recreational or local sports in the Sports Section. (Lloyd 49-50).  Johnson, however, failed to follow this instruction and continued to

emphasize major men's sports to the exclusion of recreational and/or women's sports. (Gray 144-45; Gray Decl. 3). In September of 2007, the Ladies Professional Golf Association ("LPGA") hosted a tournament in the Montgomery area, and Lloyd and Gray wanted full coverage of the event. (Lloyd 60; Gray 108-09). Johnson, however, failed to attend a media luncheon hosted by the LPGA and did not assign a reporter to cover the event or the tournament. (Lloyd 55-56; Gray 109). At the last minute, Lloyd and Gray had to assign a part-time reporter from another section of the paper (i.e., not a sports reporter) to cover the LPGA tournament. (Gray 110-11).

In January of 2008, Lloyd directed all of the team leaders, including Johnson, to attend a meeting and bring with them nominations for an internal contest. (Johnson Ex. 10; Lloyd 117). Johnson came to the meeting unprepared and without any nominations, resulting in a delay of the meeting. (Lloyd 117). Lloyd sent Johnson an e-mail telling him that his lack of preparation was not acceptable and instructing him to prepare for the next day's meeting. (Johnson Ex. 10).

Johnson's 2008 annual performance appraisal was strikingly similar to his prior appraisals, as his performance had not improved. (Johnson Ex. 11). Johnson was again instructed to schedule weekly meetings with the Local Editor, and concerns were again noted regarding his interpersonal skills, which caused tensions

with co-workers and managers.  (Johnson Ex. 11, ID 00167-68).  The appraisal further states that "[a]reas that need [Johnson's] attention are controlling expenses, scheduling and time management for his staff.  It's important in tough financial environments that [Johnson] recognizes the importance of controlling costs— overtime, traveling expenses, freelance expenditures."  (Johnson Ex. 11, ID 00168).  Likewise, Johnson acknowledged in his 2008 self-appraisal that making time to plan was still a challenge for him.  (Johnson Ex. 12, ID 00175).

In April of 2008, employees reported to Gray an "angry display" by Johnson when he became frustrated and repeatedly slammed the telephone receiver down and made disparaging remarks about a source.  (Johnson Ex. 13).  Gray wrote a disciplinary memo to Johnson detailing the incident and further stating that over the past several months staff members had complained about "an increasingly uncomfortable work environment at night," referencing Johnson specifically. (Johnson Ex. 13).  Gray further cautioned, "You are a valued member of our team, but I will not nor cannot tolerate a staff member who makes his colleagues uncomfortable."  (Johnson Ex. 13).  When counseled about this angry display, Johnson told Local Editor Gary Maitland that he was aware of his "temper flare-ups" and that he would think through situations.  (Johnson 273, Ex. 13). Nevertheless, Johnson did not maintain control of his temper.  (Johnson Ex. 14).

In May of 2008, Johnson was involved in yet another angry outburst when he got into an argument with Multimedia Editor Terry Manning. (Johnson Ex. 14). During this argument, Johnson used profanity and physically threatened Manning with a baseball bat. (Johnson 282-83; Gray 172-74; Lloyd 74-75). Although he could have been terminated for this violent incident, the Advertiser elected to give Johnson another chance. (Lloyd 75). Johnson received a performance warning and was instructed to "control [his] anger and refrain from insubordination and using profane language in a threatening and loud manner." (Johnson Ex. 14).

In June of 2008, Johnson received another performance warning due to misuse of the company credit card. (Johnson Ex. 16). Johnson had used his company credit card to purchase food and gas for personal use. (Lloyd 70-72; Johnson Ex. 16).

Johnson again received a performance warning in August 2008. (Johnson Ex. 17). In preparation for the Summer Olympics in Beijing, Lloyd and Gray directed Johnson to feature stories of any Olympic athletes with local ties. (Gray 120-24; Lloyd 62-64). Six weeks prior to the start of the Olympics, senior editors learned that an Olympian's mother had recently moved to the neighboring community of Prattville, which is in the Advertiser's market. (Gray 121-22; Johnson Ex. 17). A friend of the Olympian's mother called the Advertiser with contact information for the mother and requested that the Advertiser cover the

local angle of the story, a suggestion that worked well with the paper's shift to a LIC. (Johnson Ex. 17). The story, however, was never run, causing the Advertiser to miss the local story and causing damage to its reputation with members of the community. (Johnson Ex. 17; Gray 123-24). Johnson's was cautioned, "We value your skills, but this failure to do fundamental duties will not be tolerated. Another such offense could result in dismissal." (Johnson Ex. 17).

### D.   Johnson's Performance Improvement Plan

On August 28, 2008, after more than a year of poor performance from Johnson, and multiple performance warnings, Lloyd and Gray placed Johnson on a 90-day Performance Improvement Plan. (Lloyd 40-41). The Advertiser uses PIPs to identify areas of improvement for employees who are not performing at an acceptable level and to work with those employees to improve their performance; the goal is for the employee to complete the program successfully and remain and contributing member of the Advertiser staff. (Lloyd 22). The PIP listed multiple areas for improvement in Johnson's job performance, specifically identifying the following deficiencies in his job performance: an inability and/or unwillingness to plan, including planning coverage for big events; ineffective communication; failure to adhere to company policies; and inappropriate behavior in the

workplace.[3] (Lloyd 40-44, Johnson Ex. 18). Throughout the 90-day PIP, Gray met with Johnson to assess his performance in the outlined areas. (Gray 183-84, Johnson Ex. 18, ID 00017). Gray also sent follow-up memos detailing the content of their discussions. (Johnson, Exs. 19-21).

In addition to identifying the problems, the PIP outlined steps for Johnson to take to correct them. (Johnson Ex. 18, ID 00017). These steps included a number of items that Gray had previously discussed with Johnson: monthly meetings with the sports team and Managing Editor to plan coverage; deadlines for centerpieces and special sections; communication with his reporters regarding the importance of covering women's sports; and conscious assigning of stories in women's sports. (Johnson Ex. 18, ID 00017). The steps for improvement included taking responsibility for coverage of the Navistar LPGA tournament and major sporting events like the Olympics; scheduling a weekly meeting for the sports team; holding one-on-one coaching sessions with reporters; and developing regular budgets for sports stories. (Johnson Ex. 18, ID 00017). On the PIP, the Advertiser directed Johnson to "[c]ontrol overtime by managing reporters' hours through direction in

---

[3] Specific examples of these problems included: (a) Johnson's inability or unwillingness to plan often manifested itself in his lack of a plan for the next day's Sports Section. (Lloyd 44); (b) news budgets required by the Advertiser often contained no budget lines from the Sports Department. (Lloyd 45); (c) there were no written plans for some large sporting events, such as the 2008 Olympics and the LPGA tournament. (Lloyd 48-49; Johnson Ex. 18); (c) Johnson did not effectively communicate with his staff, as he did not relay to them when they were required to attend meetings. (Lloyd 55-59); (d) he did not consistently hold monthly staff meetings. (Lloyd 101); (e) he did not communicate budgets for stories as required. (Lloyd 55-59); and (f) he was responsible for submitting daily centerpieces (compelling feature stories reserved for days without breaking news) and Sunday centerpieces, which he routinely failed to do. (Gray 149; Lloyd 100).

coverage" and to consult with managing and executive editors about using freelance reporters. (Johnson Ex. 18, ID 00017). Finally, the Advertiser required that Johnson speak with respect to his coworkers and control outbursts in the office. (Johnson Ex. 18, ID 00017).

Other management employees at the Advertiser have been placed on PIPs and have successfully completed them. (Lloyd 23-24). For example, Multimedia Editor Terry Manning was placed on a PIP so that he could improve his use of multimedia and his sense of urgency. (Lloyd 23-24). Likewise, Local Editor Gary Maitland was placed on a PIP to improve his editing of stories. (Lloyd 23-24). Both Manning and Maitland successfully completed their PIPs and remained employed by the Advertiser at their conclusion. (Lloyd 23-24). Other Advertiser employees have also been placed on PIPs and have been terminated for their failure to successfully complete them. (Freisleben Decl. 1-2).

Johnson's performance did not improve consistently during his PIP. (Gray Decl. 4). Johnson testified that he viewed the PIP as a "joke" and a "farce" and announced to his staff shortly after receiving the PIP that he would be gone from the Advertiser at the end of the 90-day PIP "one way or another." (Johnson 144, 281, 296, 299, 393). In fact, Johnson had been looking for another job for quite some time prior to his termination, including two interviews with one company, and planned to leave the Advertiser at the end of his PIP. (Johnson 59, 144-45).

Johnson testified that he "just kind of star[ed] out the window" when Gray met with him about the PIP, and that he "never even thought about" what Gray wanted him to do during the 90-day PIP period.  (Johnson 295, 302).  Johnson did not modify his performance as outlined by the PIP, with the possible exception of changing the level of detail in his budgeting for some stories.  (Johnson 300-01). This minor improvement was insufficient to constitute Johnson's satisfactory completion of the PIP. (Gray Decl. 4).

Two weeks into his PIP, despite Gray's clear direction to him to cover the LPGA tournament, Johnson still had failed to assign a sports reporter to cover the event. (Johnson Ex. 20).  Johnson had also missed deadlines for 90-day reviews of two part-time employees, was not attending afternoon budget meetings, and had made inappropriate comments including foul language to the Video Editor. (Johnson Ex. 20).

During week three, Gray noted improvements in several of Johnson's PIP categories, and offered him positive feedback along with constructive criticism. (Johnson Ex. 21).  She specifically noted that she had pre-approved overtime for two or three of Johnson's reporters.  (Johnson Ex. 21).  Nevertheless, Johnson again failed to hold weekly team meetings as instructed.  (Johnson Ex. 21).

The improvements of week three did not last; Gray's assessment of weeks six, seven, and eight of the PIP states that Johnson "hit a plateau" in improving his

performance. (Johnson Ex. 19). Johnson did not notify Gray when he assigned freelance writers as requested, did not hold the monthly sports team meeting requested in her last discussion with him, was not lining up centerpieces in the assigned timeframes, and did not hold weekly team meetings. (Johnson Ex. 19).

On November 11, 2008, during Johnson's PIP, Lloyd received a complaint from a customer who called Johnson to discuss the lack of coverage of a University of Florida championship game. (Lloyd 77-80; Johnson Ex. 22). The customer complained to Lloyd that Johnson was rude on the telephone, responding to the customer's complaint by saying, "Don't you know what state this is?" (Johnson Ex. 22). Lloyd gave Johnson a final performance warning, stating that failure to control his behavior with customers and colleagues would result in disciplinary action, up to and including termination. (Johnson Ex. 22).

Also during his PIP, Lloyd and Gray specifically instructed Johnson to work with a newspaper in Florida to cover the 2008 SEC Championship football game between the University of Florida and the University of Alabama. (Lloyd 106-110). Although Johnson's counterpart at the Florida paper submitted detailed plans for the proposed joint coverage, Johnson failed to submit plans or otherwise coordinate coverage with the Florida paper. (Lloyd 106-110).

**E.    Johnson's Termination**

On November 21, 2008, eight days before one of the biggest sporting events in the state – the Iron Bowl - Lloyd, with input from Gray, terminated Johnson's employment because he failed to improve his performance during his PIP. (Lloyd 87-88). Lloyd provided Johnson with a letter detailing the reasons for his termination, all but the most recent of which – his lack of planning for the SEC Championship and bowl issues of the Game Day section, and an instance of shouting at one of his reporters – had been previously addressed either through performance warnings, appraisals, his PIP, or a combination of all. (Lloyd 90, Johnson Ex. 23, ID 00002). As a result of Johnson's November 21, 2008 termination, the Advertiser lacked a Sports Editor throughout not only the week of the Iron Bowl, but also during the SEC Championship game, in which the University of Alabama, a team the Advertiser covered heavily, played. (Gray Decl. 5). The timing of Johnson's termination was terrible for the paper, and Gray had to perform both the duties of Sports Editor and Managing Editor until a new Sports Editor was hired. (Gray Decl. 5). Nevertheless, Lloyd and Gray felt that Johnson's poor performance, including his complete disregard for the PIP, his lack of planning for the SEC Championship, and his inappropriate yelling at a sports reporter, mandated his termination at that time. (Gray Decl. 5).

**F.   Overtime Compensation by the Advertiser and Johnson's Complaints**

On January 29, 2010, Johnson filed the underlying lawsuit against the Advertiser, alleging that his termination was in retaliation for alleged complaints under the Fair Labor Standards Act.  (Johnson Ex. 24).  Specifically, Johnson alleges that the Advertiser retaliated against him based on his alleged complaints to Lloyd and Gray that non-exempt sports reporters were underreporting their hours worked.  (Johnson Ex. 24).

The Advertiser's policy requires that all non-exempt employees be paid for the hours that they work.  (Johnson Ex. 4, ID 00065).  Non-exempt employees record their time for each week on a timecard.  (Johnson Ex. 4, ID 00066; Lloyd 14).  Under Advertiser policy, "Non-exempt staff members are expected to accurately record all hours worked each week. … Falsification of a time card may lead to disciplinary action up to and including dismissal."  (Johnson Ex. 4, ID 00066). This policy is enforced, and employees have been disciplined for failing to accurately report their time.  (Brown 34).  During Johnson's employment, Lloyd and Gray emphasized to staff members the importance of accurately recording their time so that they could be compensated for all time worked.  (Lloyd 17; Gray 20).  Also, new members of management received training regarding the recording and payment of time from the Advertiser's Human Resources Director Linda Browder.  (Gray 17).

The Advertiser requires employees to request preapproval for any expected overtime prior to incurring it. (Johnson Ex. 4, ID 00066; Lloyd 18-19). Employees must obtain preapproval of overtime so that a member of management may determine whether the requisite work can be performed without incurring the expense of overtime, a process that balances the competing interests of overtime expense and the need to produce a quality product. (Lloyd 18-19; Gray Decl. 2). Thus, an exception exists for breaking news, which may warrant overtime without preapproval. (Lloyd 20). Overtime is an important issue to the Advertiser, as unauthorized overtime can result in unbudgeted expenditures. (Gray Decl. 2). Because the newspaper industry has suffered in recent years, layoffs are not uncommon and have occurred at the Advertiser. (Johnson 64; Gray Decl. 1-2). Controlling the amount of overtime worked helps the Advertiser control its expenses with the goal of avoiding additional layoffs. (Gray Decl. 2).

The sports reporters who reported directly to Johnson were non-exempt hourly employees, who were supposed to work 40 hours per week unless overtime was warranted and preapproved. (Gray 27). The sports reporters did not have a set schedule, because it varied depending on the week's assignments. (Gray 27-29). Johnson bore the responsibility of assigning sports reporters to stories and managing the schedules of his reporters. (Gray 29). As the manager of the sports reporters, Johnson was responsible for controlling and directing their schedule and

hours in such a way that stories were covered with a minimum amount of overtime necessary. (Lloyd 37).

Johnson testified that he voiced concerns to Lloyd and Gray, as well as to Linda Browder, that the workload assigned to the sports reporters could not be completed in 40 hours per week. (Johnson 226-27). This was precisely the problem – as a manager, Johnson failed to make the difficult decisions of which stories to cover, resulting in repeated requests from him or from his reporters for authorization of overtime. (Gray 94-97; Gray Decl. 3). Johnson testified that he first raised his concern with Lloyd, Gray, and Browder in the summer of 2007. (Johnson 235, 259). Johnson also testified that Browder responded by saying that the sports reporters should record the hours that they worked on their timecards, a directive that Johnson claims he gave to his reporters. (Johnson 237-38; Complaint ¶ 17). When Johnson mentioned that he thought some of the sports reporters were underreporting their time on their time cards, Lloyd, Gray, and Browder stressed to him that the Advertiser pays its employees for all work performed. (Lloyd 36; Johnson 237-38, 250). At all times, the sports reporters were paid based on the amount of hours reported, including any overtime, which is the only way the Advertiser knows the number of hours worked. (Gray Decl. 3). In fact, Johnson signed the timecards submitted by the sports reporters prior to their review by the payroll department, and the Advertiser relied on the reporters' representations

combined with Johnson's signatory approval to determine that the hours were worked as reported. (Gray Decl. 3). Johnson admits that his reporters received compensation, including overtime, for all hours they reported. (Johnson 228, 347).

Johnson complained to Lloyd, Gray, and Browder about being "understaffed and overworked" throughout his employment as sports editor. (Johnson 291). Gray discussed this complaint with Johnson on a number of occasions, advising him to be more selective in the events that he covered, while remaining mindful of the quality of the paper and abiding by specific instructions from his supervising managers. (Gray 86; Gray Decl. 3). Gray and Lloyd believed that the problem was not that the sports reporters could not accomplish their jobs without incurring overtime, but that Johnson never made the difficult but necessary decisions about which stories needed to be covered and which did not. (Gray 86, 297).

Johnson allegedly complained to Browder two days prior to his being placed on a PIP about "being understaffed and overworked and all the other things that [he] continued to bring up for [his] whole tenure." (Johnson 291). Johnson speculates that Browder "betrayed" him and Gray "stabb[ed him] in the back" by placing him on the PIP after he had asked them for help. (Johnson 290-91). Admittedly, however, Johnson never heard Browder discuss their alleged conversation with Gray. (Johnson 293).

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is proper under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  While all *reasonable* doubts must be resolved in the non-movant's favor, the trial court is not required to "resolve *all* doubts in such a matter." Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987) (emphasis added).   Summary judgment is proper unless evidence favoring the non-movant is sufficient for the finder of fact to find for that party. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).

Although the movant has the initial responsibility of informing the Court of the basis for its motion and identifying evidence that demonstrates the absence of any genuine issue of material fact, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.

## B.   Johnson's Fair Labor Standards Act Claim Fails

The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"), prohibits employers from retaliating against an employee for complaining of a violation of the FLSA.  Section 15(a)(3) of the FLSA provides as follows:

> …it shall be unlawful for any person –
>
> (3)    to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee; …

29 U.S.C. § 215(a)(3) (Supp. 2010).

To establish a *prima facie* case of FLSA retaliation, Johnson must demonstrate (1) that he engaged in protected activity under the Act; (2) that he suffered adverse action by the Advertiser; and (3) a causal connection existed between his protected activity and the adverse action.  Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000).  If Johnson establishes a *prima facie* case of retaliation, the burden shifts to the Advertiser to articulate a legitimate, non-retaliatory reason for his termination.  Raspanti v. Four Amigos Travel, Inc., No. 07-12137, 2008 U.S. App. LEXIS 2230, * 5 (11th Cir. Jan. 29, 2008).  Then, Johnson bears the burden of establishing that the reasons provided by the Advertiser are pretextual by showing that the reasons "unworthy of belief."  Hill, 236 F. Supp. 2d at 1300.

In this case, Johnson can neither establish a *prima facie* showing of retaliation, nor overcome the Advertiser's legitimate, non-retaliatory reasons for his termination.   Thus, summary judgment is due to be granted in favor of the Advertiser.

### 1.   *Johnson cannot establish the first prong of a* **prima facie** *case of retaliation because he did not engage in protected activity.*

Section 15(a)(3) of the FLSA purports to protect those who have "filed any complaint or instituted or caused to be instituted any proceeding."   The Eleventh Circuit has interpreted the FLSA as providing protection from retaliation to those who bring "informal complaints" to their employers about FLSA violations.   <u>See, e.g.</u>, <u>Ramos v. Collins & 74th Street, Inc.</u>, No. 07-21478, 2008 U.S. Dist. LEXIS 57381 (S.D. Fla. 2008), <u>citing</u> <u>E.E.O.C. v. White and Sons Enters.</u>, 881 F.2d 1006, 1011 (11th Cir. 1989).   Notably, however, several other circuits read the statute as written, and interpret § 15(a)(3) to apply only to individuals who have filed complaints and/or instituted proceedings, and not to employees who orally complain to their employer.   <u>See, e.g.</u>, <u>Ball v. Memphis Bar-B-Q Co.</u>, 228 F.3d 360, 363-365 (4th Cir. 2000); <u>and</u> <u>Lambert v. Genesee Hosp.</u>, 10 F.3d 46, 55 (2d Cir. 1993) ("The plain language of this provision limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor.").   At least one court has struck a balance, applying the retaliation provision to an individual who has

provided a written internal complaint to his employer but not to one who has merely complained orally.  See Kasten v. Saint-Gobain Perf. Plastics, 570 F.3d 834 (7th Cir. 2009).

This issue is currently pending before the Supreme Court of the United States, which granted certiorari in March of 2010 to answer the following question: "Is an oral complaint of a violation of the Fair Labor Standards Act protected conduct under the anti-retaliation provision, 29 U.S.C. § 215(a)(3)?"  Kasten v. Saint-Gobain Perf. Plastics Corp., No. 09-834, 130 S. Ct. 1890, 2010 WL 128339 (Mar. 22, 2010).  Because Johnson did not file a written complaint with the Advertiser, a written complaint with an outside agency, or otherwise institute a proceeding, the Advertiser submits that he did not engage in protected activity as explicitly defined in the statute.  Should the Supreme Court of the United States affirm the Seventh Circuit's ruling in Kasten, summary judgment is due to be granted in favor of the Advertiser on this basis alone.

Further, Johnson's complaints to his supervisors did not constitute protected activity because his complaints revolved around being "understaffed and overworked." (Johnson 291).  By his own description, Johnson complained that his reporters could not complete their assignments in a 40-hour workweek, and not that they were being denied compensation for overtime worked.  (Johnson 226-27).

To the contrary, Johnson testified that the sports reporters whom he supervised were paid for the hours that they worked. (Johnson 228, 347).

The Advertiser compensates its employees for overtime hours worked, and the Advertiser requires that its employees accurately report their time and that supervisors approve the completed timecards by signature. (Gray Decl. 3; Johnson Ex. 4, ID 00066). Johnson simply resisted Lloyd and Gray's instructions to him to make coverage decisions and manage his reporters' schedules so that they would not incur unnecessary overtime. (Gray 86, 94-97). Johnson's complaints about being short-staffed, and his unsupported speculation that his reporters were violating Advertiser policy by underreporting their time despite his signatures certifying that the timecards were correct, were not complaints about FLSA violations by the Advertiser and therefore do not amount to "protected activity."

2.   *Johnson fails to state a* **prima** **facie** *case of retaliation because no causal connection exists between his protected activity and the adverse action.*

Assuming, *arguendo*, that Johnson engaged in protected activity by making oral complaints to his supervisors about the workload of his reporters, Johnson cannot establish the third prong of a *prima facie* case of retaliation:   a causal connection.[4] To establish this element of the *prima facie* case, Johnson must prove that he "would not have been fired <u>but for</u> [his] assertion of FLSA rights."

---

[4] Johnson's termination is an adverse employment action and the Advertiser does not contest the second prong of Johnson's *prima facie* case of retaliation.

Raspanti, 2008 U.S. App. LEXIS 2230 at * 6 (emphasis added), quoting Wolf, 200

F.3d at 1343.  See also Reich v. Davis, 50 F.3d 962, 966 (11th Cir. 1995) (applying

the "but for" test to FLSA retaliation claims because it "balances the important

interest of protecting employee participation in protected activity against the

employer's interest in not being saddled with unsatisfactory employees, who would

have been fired anyway, just because they engage in protected activities.").

A plaintiff may establish a causal relation by showing "very close" temporal

proximity between the date that the employer learned of the protected activity and

the date of the adverse employment action.  Raspanti, 2008 U.S. App. LEXIS 2230

at * 6-7.  However, even "[a] delay of three to four months does not suffice."  Id. at

* 7 (citation omitted).  In this case, Johnson testified that he first complained to

Lloyd, Gray, and Browder about sports reporters' time cards in the summer of

2007 and that he continued to make complaints – most of which were unprotected -

- throughout his tenure at the Advertiser.[5]  (Johnson 235, 259).  Johnson was not

terminated until November of 2008, over a year later, a period during which

Johnson's performance was far below the standard required by the Advertiser.

(Johnson Ex. 23).  The span of more than a year between Johnson's initial

complaint and his termination falls well outside the "very close" range that the

Eleventh Circuit described in Raspanti and does not support a causal connection.

---

[5] As explained supra, Johnson complained that the Advertiser expected him to manage his reporters' schedules to minimize overtime.  While the FLSA mandates that employers pay for overtime incurred, not permitting employees to work overtime is not a violation of the FLSA, and his complaints to this effect are not protected activity.

Further, the Advertiser's reasons for terminating Johnson stem from his persistent performance problems and violations of company policy. Despite coachings and explicit instructions from his supervisors, Johnson's planning, communication and inappropriate behavior were problematic from his 90-day Sports Editor performance appraisal throughout his PIP and ultimately until his termination. (Johnson Exs. 9, 18, 23; Gray Decl. 4). In fact, Johnson viewed the PIP, which was designed to help him improve, as a "joke" and admitted that he made no effort to modify his performance. (Johnson 281, 300-01). Because his performance did not improve, his employment was terminated. Johnson cannot establish that "but for" his complaints regarding the sports reporters' time cards he would have retained his job; to the contrary, the evidence shows his performance problems, and not his complaints, were the motivating factors behind his termination.

Johnson's claims are further undermined by the fact that the Advertiser followed its normal procedures and practices with regard to Johnson's PIP. Further, other Advertiser employees likewise have been terminated for failure to successfully complete a PIP. (Freisleben Decl. 1-2). Johnson cannot establish a causal connection between his alleged protected activity and his termination, because his termination was caused entirely by his own performance deficiencies.

3. **The Advertiser has provided legitimate, non-retaliatory reasons for Johnson's discharge.**

Even if Johnson could establish a *prima facie* case of retaliatory discharge, the Advertiser has provided legitimate, non-retaliatory reasons for his termination. As plainly articulated in both Johnson's PIP and in his termination letter, the Advertiser terminated Johnson's employment due to multiple performance issues. (Johnson Exs. 18, 23). Rather than immediately terminating his employment for these ongoing problems, the Advertiser placed Johnson on a PIP in an effort to rehabilitate him, detailing areas of concern and outlining the Advertiser's expectations with regard to each area. (Gray Decl. 4; Johnson Ex. 18). The areas for improvement included Johnson's planning, coverage, communication, adherence to company policies, and inappropriate behavior in the workplace. (Johnson Ex. 18). Gray met with Johnson throughout the 90-day PIP to assess his performance and provide him constructive feedback, but, by his own admission, Johnson did not make any effort to improve his performance. (Gray 183-84, Johnson 300). Instead, he blatantly disregarded the opportunity to revise his behavior, ignoring Gray's efforts to aid his performance. Johnson testified that he "just kind of star[ed] out the window" when Gray met with him about the PIP, and that he "never even thought about" what Gray wanted him to do during the 90-day PIP period. (Johnson 295, 302).

Toward the end of his PIP, Johnson engaged in a shouting match with one of his reporters and failed to plan coverage of the upcoming SEC Championship and bowl editions of the sports page by the deadlines enumerated in Johnson's PIP. (Johnson 336-37; Johnson Ex. 23).   These incidents further demonstrated Johnson's continuing problems with communication, inappropriate behavior, and planning, which were the focus of his PIP. (Johnson Exs. 18, 23).  The Advertiser terminated Johnson's employment after providing him multiple opportunities to improve his performance, opportunities that he dismissed as a "farce" and a "joke" without making an effort to improve.  (Johnson 281, 299, 393).   These bases for Johnson's dismissal are legitimate and non-retaliatory, as they are wholly unrelated to any complaints about sports reporters' pay or recording of hours worked.

### 4.     *Johnson cannot show that the Advertiser's reasons for his discharge are pretextual.*

Johnson's claim of retaliation fails because he cannot show that the Advertiser's articulated reasons for his discharge are "unworthy of belief." Hill v. Manning, 236 F. Supp. 2d 1292, 1300 (M.D. Ala. 2002).  The evidence in this case includes well-documented examples of Johnson's repeated performance problems and continued attempts by the Advertiser to help him improve, as well as the specific bases for Johnson's termination.  Johnson cannot overcome this evidence by speculation and "self-serving assertions."   Ramos, 2008 U.S. Dist. LEXIS

57381 at * 12 ("plaintiff's self serving assertions fail to establish that the reason for her termination ... was pretextual").

Moreover, Johnson's testimony reveals that he cannot combat each reason for his termination.  As the Eleventh Circuit has noted, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether *each* of the defendant's articulated reasons is pretextual, the defendant is entitled to summary judgment." Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (emphasis added).  Johnson cannot create an issue of fact (much less of *material* fact) because there are a number of performance deficiencies cited in the termination letter that he does not dispute.  Specifically, Johnson admits that he failed to improve his performance during the PIP and that he had problems with his temper.  (Johnson 273, 300-01)  Johnson also admits that he had trouble with planning.  (Johnson 293-94).  Because Johnson does not dispute each and every cited reason for his termination, as outlined in the termination letter, he cannot demonstrate pretext and the defendants are entitled to summary judgment.  See Chapman, 229 F.3d at 1024.

Johnson's claim is further undermined because he can identify no similarly situated comparator who failed to improve his or her performance during a PIP, did not raise complaints about overtime or alleged FLSA violations, and was not terminated.  See Raspanti, 2008 U.S. App. LEXIS 2230 at * 10 (holding that the

plaintiff could not demonstrate pretext "because she did not present evidence that the company fabricated [its proferred reason for her termination] or that the company treated her differently from similarly situated employees.").

## IV.   CONCLUSION

Contrary to his allegations, Johnson's termination was the result of repeated, well-documented performance problems and was not retaliatory in any way. Johnson refuses to acknowledge these problems and admittedly did not try to improve his performance, despite coaching and direct instruction from his supervisors.  Because Johnson's termination was based on his performance and was unrelated to his alleged complaints, summary judgment is due to be granted in favor of The Montgomery Advertiser.

s/Lynlee Wells Palmer
Lynlee Wells Palmer (ASB-4367-T82P)

s/Anita Kay Head
Anita Kay Head (ASB-8561-T39H)

Attorneys for The Advertiser Company
d/b/a The Montgomery Advertiser

**OF COUNSEL:**

**JOHNSTON BARTON**
**PROCTOR & ROSE LLP**
Colonial Brookwood Center
569 Brookwood Village, Suite 901
Birmingham, Alabama 35209
Telephone:  205-458-9400
Facsimile:  205-458-9500

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2010, I electronically filed the foregoing via the Court's CM/ECF system, which will electronically send notice to the following counsel of record:

Heather N. Leonard, Esq.
**HEATHER LEONARD, P.C.**
P.O. Box 43768
Birmingham, Alabama 35243

s/Lynlee Wells Palmer
Of Counsel

W0748354.DOC

30