IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVID JOHNSON, | ) | |
| | ) | CIVIL ACTION NUMBER: |
| Plaintiffs, | ) | |
| | ) | 2:09-cv-92-MEF-SRW |
| vs. | ) | |
| THE ADVERTISER COMPANY, | ) | |
| INC., d/b/a THE MONTGOMERY | ) | **PLAINTIFF REQUESTS ORAL** |
| ADVERTISER, | ) | **ARGUMENT** |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S BRIEF IN OPPOSITION TO THE DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

OF COUNSEL:

Heather Leonard
HEATHER LEONARD, P.C.
P.O. Box 43768
Birmingham, AL 35243
(205) 977-5421 - voice
(205) 278-1400 - facsimile
Heather@HeatherLeonardPC.com

TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

STATEMENT OF FACTS .................................................. 1

ARGUMENT ...................................................................... 11

I.    THE DEFENDANT RETALIATED AGAINST MR. JOHNSON FOR
      COMPLAINING THAT THE DEFENDANT'S PRACTICES
      RESULTED IN REPORTERS WORKING OVERTIME FOR
      WHICH THEY WERE NOT PAID. ................................................. 12

      A.    Mr. Johnson established a prima facie case of retaliation. ...... 14

            1.    Mr. Johnson's complaints constituted protected activity
                  under the FLSA. ........................................................... 15

            2.    Mr. Johnson experienced adverse job actions. ............. 20

            3.    Mr. Johnson presented evidence that the Defendant's
                  decision to terminate his employment was motivated by
                  his complaints of the Defendant's overtime practices. . 22

      B.    Mr. Johnson presented evidence of pretext. ............................ 26

            1.    Mr. Johnson presented evidence that his performance
                  did not warrant his termination, thereby suggesting
                  pretext. ......................................................................... 30

            2.    Mr. Johnson's evidence refuting each of the reasons
                  articulated by the Defendant suggests pretext. ............. 31

                  a.    The Defendant's use of the June 18, 2008
                        communication relating to an unpaid balance on
                        Mr. Johnson's credit card suggests pretext. ....... 31

b.  The Defendant's use of a reporter's refusal to follow Mr. Johnson's direction relating to Olympic coverage suggests pretext. .................................. 33

c.  The Defendant's use of the PIP to terminate Mr. Johnson suggests pretext. ................................... 35

d.  The Defendant's reliance on Mr. Johnson's absence at an October 29 Zenger-Miller leadership class suggests pretext. ........................................ 36

e.  The Defendant's argument that it terminated Mr. Johnson because he failed to attend meetings suggests pretext. ................................................. 38

f.  The Defendant's allegation that it terminated Mr. Johnson for failing to manage his reporters' vacation schedule is pretextual. .......................... 41

g.  The Defendant's use of November 18 reader complaint that Mr. Johnson was not covering Florida sports suggest pretext. ......................... 43

h.  The Defendant ignored that Mr. Johnson had an effective plan in place for coverage of the SEC Championship and bowl games. ......................... 45

CONCLUSION .................................................................. 46

CERTIFICATE OF SERVICE ........................................................ 48

## INTRODUCTION

The Plaintiff, L.C. Johnson complained repeatedly to the Defendant during his tenure as Sports Editor at the Montgomery Advertiser that it engaged in practices which resulted in employees working hours for which they were not paid. In response to his complaints, the Defendant attempted to label Mr. Johnson a troublemaker and fabricate a case to justify his termination.  The Defendant terminated Mr. Johnson for continuing to complain that it was engaging in acts which violated the Fair Labor Standards Act ("FLSA").

## STATEMENT OF FACTS

In March or April 2006, Executive Editor Wanda Lloyd contacted Mr. Johnson about working for the Defendant as an Assistant Sports Editor.  (Johnson Deposition, 133:10-139:20).  She had received his resume from a third party.  (Id.). Mr. Johnson interviewed with the Defendant and was subsequently hired.  (Id.). As the Assistant Sports Editor, Mr. Johnson's job duties included overseeing staff (reporters/writers, copy editors and paginators), writing stories, editing stories, performing layout and page design work, mentoring and overseeing interns, public speaking, recruiting, generating ideas, and mapping out coverage.  (Johnson Deposition, 183:15-164:14).

During Mr. Johnson's tenure as the Assistant Sports Editor, the organization of the Sports Department included a Sports Editor, two Assistant Editors, a Game Day Editor,[1] five reporters/writers, five copy editors/paginators, and approximately ten (10) freelance contract writers/stringers.[2]  (Johnson Deposition, 51:7-13; 77:14-80:2; 168:18-169:9; 171:6-22; 180:13-22; Lloyd Deposition, 33:4-8).  In April 2007, the Defendant promoted Mr. Johnson to the position of Sports Editor and reorganized the department such that there was only a Sports Editor and five reporters.  (Lloyd Deposition, 32:34:4-10; Johnson Deposition 169:5-6).  As Sports Editor, Mr. Johnson performed the duties previously performed by the Sports Editor, Assistant Sports Editors and Game Day Editor.  (Lloyd Deposition 34:7-10;[3] Johnson Deposition 51:7-13; 77:14-80:2; 168:18-169:9; 171:6-22).

When Mr. Johnson became Sports Editor, the Defendant reduced his staff and eliminated his ability to use freelance/stringer writers.[4]  (Johnson Deposition

---

[1]     The Defendant's paper has a weekly section called Game Day during football season which focuses on football coverage.  (Lloyd Deposition, 33:9-12).

[2]     The Defendant paid stringers $35-$50 per story they submitted.  (Johnson Deposition 78:3-10; 224:13-15.

[3]     Ms. Lloyd agreed in her deposition that Mr. Johnson, as Sports Editor, had additional duties to perform which is predecessor did not.  (Lloyd Deposition, 35:18-23).

[4]     Mr. Johnson testified:

> Once I got promoted to sports editor, I inherited the position that formerly used to have three assistants; and I had none.  I also continued to have my staff and resources slashed.  And I was expected to and asked to do more with less continually.

77:14-80:2, 81:13-15) As a result, Mr. Johnson "was drastically understaffed and [he and his reporters] worked extremely hard and exorbitant hours." (Johnson Deposition 162:10-12). Planning became a challenge because due to the elimination of the assistant and Game Day editors as well as the use of freelance writers; Mr. Johnson did not have enough time or resources. (Johnson Deposition 204:1-2).

Despite these challenges, Mr. Johnson's supervisor, Gary Maitland, recognized his favorable execution of job duties. He received MBO bonuses[5] and the Making the Difference Award.[6] (Johnson Deposition 57:2-13). Mr. Johnson's first performance evaluation as Sports Editor rated his as "Commendable" and showed a performance trend of "Improving."[7] (Johnson Deposition, Exhibit 7 - May 30, 2007 Performance Review). He received satisfactory or very good ratings all characteristics. (Id.). The evaluation noted that he "assumed the Sports Team Leader's role just a week or so prior to the launch of the Local Information

---

(Johnson Deposition 51:7-12).

[5]     MBO stands for Management by Objective. (Johnson Deposition 178: 5-6). The MBO bonuses were awarded based on execution of job duties using job descriptions. (Johnson Deposition 178:7-22). The Defendant advised Mr. Johnson that he "was one of the few people that got any MBO bonuses at all because some people – most people didn't get any." (Johnson Deposition 177:19-23).

[6]     The Making the Difference award is "an award that is generated through the human resources department for people who go over and above their job duties." (Lloyd Deposition 25:1-5).

[7]     The other two options for performance trend were "No Change" or "Declining."

Center.  He took over the job with minimal training, but during this transitional period he has shown a willingness to work hard, an eagerness to learn and an enthusiasm for his new tasks . . . He's dedicated and dependable.  (Id.).[8]

Mr. Johnson received a second evaluation 90 days after his first.  In that evaluation, the Defendant noted that Mr. Johnson was a solid idea person and that the "past three months have been busy, difficult ones for L.C. as he adapted to his new position.  He has worked hard and put forth some positive efforts.  His enthusiasm for his new job has at times been infections.  His attention to detail, planning and organization will be very important in the months ahead as Sports enters its busiest season of the year."  (Johnson Deposition, Ex. 9 - Performance Appraisal dated July 27, 2007).[9]

When Mr. Maitland evaluated Mr. Johnson a third time in 2008, he noted "L.C. was the driving force in the redesign of the weekly Game Day college football section.  Under his guidance, the sports staff stayed abreast of breaking developments and provided readers with well-rounded coverage on both the high school and collegiate levels."  (Johnson Deposition, Ex. 11 - Performance

---

[8]     In the section for areas of improvement, the Defendant advised Mr. Johnson that he "needs to be a bit more assertive with his employees."

[9]     This evaluation noted a complaint from a photographer who Mr. Johnson directed to cover a story.  (Johnson Deposition, 206:6-208:19, Ex. 9).  In acknowledging the complaint, the evaluation noted "that's ok . . ." and Mr. Maitland told Mr. Johnson that the photographer could be difficult, and that Mr. Johnson's conduct fell within his rights as a manager.  (Id.).

Appraisal dated March 10, 2008).  Mr. Johnson received a "Commendable" rating, and the evaluation noted the following in the section entitled "Please elaborate and indicate plans for improvement/development:" "L.C. has done a good job of providing daily budgets, and his willingness to voluntarily change the format of the Sports budgets to match the format being used in news was appreciated . . .," "L.C. has done a good job of directing his staff this past year - holding meetings, making assignments, coordinating coverage of events . . ."  (Id.).  He received "Very Good" ratings for volume of work, dependability and initiative, and "Satisfactory" ratings for quality of work, administrative control, knowledge of work, judgment ability, planning/organization, leadership, creativity, communications, relationships and attitude.  (Id.).

Mr. Johnson observed his five (5) reporters were working extreme hours to meet the Defendant's demand for quality and quantity of content.  Mr. Johnson's reporters worked well in excess of 40 hours a week, but were not always getting paid for their time.  (Johnson Deposition 242:17-243:14).  He recalled that "with the beats that we had in a rabid football state in Alabama; covering those schools alone, you are not confined to a 40 hour work week . . . I wasn't holding a gun to their head saying like work 50 hours.  But they were having to work 50 hours because their job demanded that they do."  (Johnson Deposition 227:10-19).[10]  As a

---

[10]     He noted that the particular demands of the 2008 fall/football season made a 40 hour work week nearly impossible and led to reporters under-reporting the hours they worked.

He recalled:

> Q:   Was it your understanding that if they worked overtime that they would not be paid for it?
>
> A:   No.  It was my understanding that at a certain point, I can't remember exactly what month, that they couldn't work overtime.  But the fact is they were working overtime because, again, you know, you don't get the schedule when breaking news is going to happen.  Just think about all of the tumultuous stuff that was going on at Auburn and Alabama alone and Alabama State.  Alabama State was in the throes of NCAA violations.  There was breaking news coming from that beat all the time.  Alabama had like one of the most historic programs in the history of college football.  They just hired Nick Saban.  They were making a run for the National Championship.  Auburn was in the throes of getting rid of a coach that had been there for ten years, been one of the winningest coaches in the SEC.  There were stuff going on constantly. . .
> . . .
>
> Those guys were doing their job.  You are at a game, you're at press conferences.. You've got stories to do; you've got responsibilities.  So you can't just automatically imagine that you're able to do a 60 hour week in 40 hours just because they say they've got a budget crunch.
>
> So what happened was I went to HR repeatedly and said, look, Linda, I feel that my hands are tied; my back's against the wall.  My guys are really painted into a corner with regard to not being able to do the job that they are assigned to do.  We got this ridiculous suggestion or demand to not work overtime.  Like I said, we – we didn't control that.  I wasn't giving them extra assignments.  These are assignments that were part of the natural week.  In fact, I gave Mel Gray a detailed list about what my guys did every day of the week.  I put the times that  – you know, the times that – including press conferences, travel, game time, blogging, video, game day.  That's a seven day a week job. . . .
> . . .
>
> Now, what they did as a result of that, I said, guys, Mel says you can't work more than 40 hours a week.  So that's when the guys did in order – okay, L.C. we're going to try to not get you in trouble even though that you and I know what we are working 40 hours a week and Mel and Wanda know and they are just ignoring it.  They started fudging their time card to make it add up to 40 hours a week.
>
> I showed Mel Gray.

result of the time demands relating to covering sports, his reporters lied about the hours they worked and only reported 40 hours a week.  (Johnson Deposition 249:8-250:3[11]).  This was the result of Mel Gray and Wanda Lloyd discouraging employees from writing down overtime they worked.  (Johnson Deposition 256:12-257:23).[12]

Mr. Johnson complained to human resources, Mel Gray and Wanda Lloyd at least ten (10) times from 2007 through the end of his employment that the Defendant's practice of disallowing overtime was forcing his employees to under-report their hours on their time cards, and as a result, the Defendant was not paying the reporters for all of the time that they worked.  (Johnson Deposition, 226:20-

---

(Johnson Deposition 228:7-232:4).

[11]    Q:    Okay.  That the reporters were lying on their time cards about the number of hours that they were actually working?

        A:    Forcibly after Mel and Wanda gave me the 40-hour week.  Forcibly lying on their time cards.

        . . .

        Q:    Did you sign time cards that you knew were not accurate?

        A:    I don't think I did.  Because by the time – no.  By the time – like I said, by the time I became sports editor, I think Mel had taken over all of that under – that was all part of the LIC configuration, too.

[12]    This problem was not limited to the sports department.  Hillary Funk, a reporter who covered the East section for the Defendant from August 2007 through December 2008, testified that she and her fellow reporters felt pressure to work overtime hours to deliver breaking news but to not report the hours they worked that exceeded 40 hours a week.  (Funk Deposition, 9:20-11:8, 32:3-33:22, 35:1-36:19, 55:1-11, 62:7-63:1).  She admitted that she knowingly turned in false time cards, failing to claim time worked in excess of 40 hours a week, as a result of this pressure and fear of getting laid off.  (Id. 13:22-16:9, 28:9-30:6; 55:1-11, Ex. 1 - Email of April 18, 2010).

227:3, 230:12-237:21, 250:4-22, 244:11-246:9, 258:13-259:5, 261:4-22, 266:1-12;

Brown Deposition 37:5-21[13]; Lloyd Deposition 20:18-22[14]).  He was insistent that

---

[13]     Mr. Brown, the President and Publisher for the Defendant during the events relevant to Mr. Johnson's complaints, testified:

Q:     Do you know if Mr. Johnson expressed to anyone any concerns about the way his reporters were getting paid?

A:     There may have been – there was an issue one time about comp time.
       . . .

       And a practice that was taking place in the sports department.  And other than that, I don't recall anything.  There was another instance where I think L.C. was concerned about producing the amount of content they needed to produce in a week and whether or not they could do that in the forty hours.

       Probably in '06 or '07, we began to take steps to reduce overtime.  And so I know – I remember having some general discussions with different employees about that in our practice.

[14]     Ms. Lloyd testified:

Q:     Has anyone communicated to you that employees, reporters, were underreporting their time?

A:     Well, **Mr. Johnson was certainly vocal at one point during his tenure.**

(emphasis added).

However, Ms. Lloyd chose not to investigate to determine whether reporters were under-reporting their time.  She recalled in her deposition:

Q:     Did you do anything to determine whether reporters in the sports department were underreporting their time?

A:     I did not.

Q:     Did you ask anyone to?

A:     I did not.

Q:     But you would agree Mr. Johnson had told you that the reporters were essentially underreporting their time?

his employees get paid for the work they did.  (Johnson Deposition 238:18-239:22).

The Defendant would not allow Mr. Johnson's reporters to take time off from work in the summer.  (Johnson Deposition 246: 10-14).  Mr. Johnson complained to  Human Resources, Mel Gray and Wanda Lloyd that his reporters were not being allowed to take accrued comp time in the summer when sports news was slower.  (Johnson Deposition, 226:20-227:3; 240:4-241:18).  He emphasized that the reporters should be allowed to take their comp time or receive payment for the overtime they worked.  (Id.)

Following Mr. Johnson's repeated complaints to the Defendant about overtime issues, the Defendant placed him on a Performance Improvement Plan ("PIP").  (Doc. 1 - Verified Complaint, ¶ 21; Johnson Deposition, 280:23-281:23,[15]

---

A:      I believe that's what he said.

(Lloyd Deposition 37:19-38:5).

[15]      Mr. Johnson's deposition testimony reads:

Q:      Did you feel like there was any action – any specific action taken against you for reporting any of those things?

A:      Were there any actions taken against me for reporting those things?  Yes. . . .  I think that I was kind of like a pain in their butt because I was the one who always brought things that – that weren't right.  I thought that this PIP was an absolute joke.  And I told Mel Gray that I thought it was a witch hunt . . . And I thought this was exactly retribution for me having stood up against them . . . And I thought that, you know, because I voice that, yes, I think it did – it did come back to sort of haunt me.

9

391:3 - 20).[16]  Mr. Johnson was astounded when placed on the PIP because a few days before he had complained to human resources.  (Johnson Deposition 290:21-292:18).  Ms. Gray did not offer to help Mr. Johnson to address any of the issues in the PIP.  (Johnson Deposition 294: 12-21; 298:1-8).  During this period of time, Miss Gray met with Mr. Johnson on a weekly basis, but never for more than ten (10) minutes, to give him feedback on his performance.  (Doc. 1 - Verified Complaint, ¶ 22).  Ms. Gray's comments consisted of "you did a better job this week," without offering any constructive advice or suggestions.  (Id.; Johnson Deposition 298: 1-8).  Mr. Johnson could not recall "having one of those meetings and her saying like, oh, you dropped the ball this week."  (Johnson Deposition 298: 21-23).

On or about November 21, 2008, Wanda Lloyd made the decision to terminate Mr. Johnson's employment.  (Lloyd Deposition 87:5-15, 89:20-90:3).  She testified in her deposition that her Interoffice Memorandum to Mr. Johnson

---

[16]     Mr. Johnson, when asked what role his complaints about overtime issues played in his termination, testified:

> I think they played a huge part. . . . I was kind of looked upon as being a whistle blower in some regard because I was shedding light on something that, one, the Montgomery Advertiser had been guilty of abusing . . . once this PIP was given to me that I had virtually no chance of saving my job . . . at that point they just started nitpicking at things, you know, none of which were firable.  And certainly if they were firable, I wouldn't have stayed in the job as long as I did.

dated November 21, 2008 contained all of the reasons for his termination.  (Lloyd Deposition 89:13-19).

The Defendant replaced Mr. Johnson with Brad Zimanek.  (Lloyd Deposition 11:4-6).  Mr. Zimanek's job differed from Mr. Johnson's in that the Defendant decided to drop coverage in some areas "so that we could get the work done." (Lloyd Deposition 111:4-23).

ARGUMENT

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor.  *See id.* at 255.

I.    THE DEFENDANT RETALIATED AGAINST MR. JOHNSON FOR COMPLAINING THAT THE DEFENDANT'S PRACTICES RESULTED IN REPORTERS WORKING OVERTIME FOR WHICH THEY WERE NOT PAID.

The purpose of the FLSA, as codified in 29 U.S.C. § 202(a), is to improve "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." According to the U.S. Supreme Court, the FLSA must be interpreted broadly in accordance with this "remedial and humanitarian" purpose. *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944).  The Court noted, "[w]e are not dealing with mere chattels or articles of trade but with the rights of those who toil. . . . Those are rights that Congress has specifically legislated to protect. Such a statute must not be interpreted or applied in a narrow, grudging manner." *Id.*

In order to provide both an incentive and protection for employees to report wage and hour violations by their employers, Congress prohibited retaliation against employees raising an FLSA complaint. *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960). Rather than instituting a system of supervision or inspection of payroll records, "Congress chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied." *Mitchell*, 361 U.S. at 292. Without protection, "fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions." *Id.* at 292-93. The Supreme Court reasoned that if employers were free to retaliate against workers who asserted rights under the FLSA, "[r]esort to statutory remedies might . . . often take on the character of a calculated risk," and that in the face of such a risk, "employees understandably might decide that matters had best be left as they are." *Id.* at 293. The Court concluded, "[w]e cannot read the Act as presenting those it sought to protect with what is little more than a Hobson's choice." *Id.*

The anti-retaliation provision codified at 29 U.S.C. § 215(a)(3) provides that an employer may not discharge or in any other manner discriminate against an employee for complaining his employer violated the FLSA, which contains minimum wage and overtime requirements. *See* 29 U.S.C. §§ 206-207. The United States Supreme Court recognized the principal purpose of section 215(a)(3)

is to remove fear so that employees feel free to report the wage and overtime violations of their employer to ensure that compliance with the Act is enhanced. *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 292, 4 L. Ed. 2d 323, 80 S. Ct. 332 (1960); *Bailey v. Gulf Coast Transportation*, 280 F.3d 1333, 1336-1337 (11th Cir. 2002).

In the Eleventh Circuit, retaliation claims under the FLSA are analyzed using the familiar burden shifting framework used to analyze claims of retaliation brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., as first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (plaintiff must first present a prima facie case; if the employer asserts a legitimate reason for the adverse action then the plaintiff may attempt to show pretext); *see also Bythewood v. Unisource Worldwide, Inc.*, 413 F.Supp.2d 1367, 1372-73 (N.D. Ga. 2006); *Burnette v. Northside Hosp.*, 342 F.Supp.2d 1128, 1133 (N.D. Ga. 2004).

A.   Mr. Johnson established a prima facie case of retaliation.

"A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: (1) [the plaintiff] engaged in activity protected under [the] act; (2) [he] subsequently suffered adverse action by the employer; and (3) a

causal connection existed between the employee's activity and the adverse action."

*Wolf v. Coca-Cola Co.*, 200 F.3d 1337 (11th Cir. 2000) (citation omitted).


      1.    Mr. Johnson's complaints constituted protected activity under the FLSA.

Informal oral complaints to employers by their employees constitute

protected activity under the anti-retaliation provision of the FLSA. *See EEOC v.*

*White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989) (explaining that,

"unofficial complaints expressed by the women to their employer about unequal

pay constitute an assertion of rights protected under the statute, and "[b]y giving a

broad construction to the anti-retaliation provision to include the form of protest

engaged in here by the charging parties, its purpose will be further promoted."); *see*

*also Hagan v. Echostar Satellite*, LLC, 529 F.3d 617, 626 (5th Cir. 2008)

(providing that informal internal complaints may constitute protected activity

under the FLSA).

    "In other words, the fact that an employee does not refer specifically to the

FLSA does not mean his informal complaint is unprotected, so long as the

complaint concerns the employer's wage and hour practices." *Burnette v.*

*Northside Hosp.*, 342 F. Supp. 2d 1128, 1133-1334 (N.D. Ga. 2004)(*citing*

*McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996) ("In order to

engage in protected activity under [the FLSA] , the employee must . . . file (or

threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA." (citations omitted)).

Mr. Johnson presented evidence that he repeatedly complained to the Defendant that its practice of refusing to authorize overtime hours to his reporters put the reporters in a position that they were under-reporting the hours they worked in order to comply with the Defendant's 40 hour a week maximum policy.[17]  Mr. Johnson was insistent with the Defendant that his reporters get paid for the work that they did.  (Johnson Deposition, p. 238:18-239:22).  He took the complaints to the Defendant because his staff was scared of punishment for accurately reporting overtime.  (Johnson Deposition, 238:1-17).  He testified about his complaints:

- "I was going to HR with concerns as well as Mel and Wanda telling them like, look, my guys are working over 40 hours a week because that's what the job entails.  So you are either going to tell me you're

---

[17]     Hillary Funk, a reporter who worked in another department for the Defendant, testified that she and other reporters felt pressured to work overtime but not report it due to the pressure to deliver stories.  (Funk Deposition, 9:20-11:8; 32:3-33:22; 35:1-36:19; 55:1-11; 62:7-63:1; Deposition Exhibit 1).  She also testified that based on her personal experience, Mel Gray had reason to know this was occurring.  (Funk Deposition, 13:22-16:9; 28:9-30:6; 55:1-11).  Ms. Funk testified that she knowingly under-reported her time because if she didn't turn in her timecard, she would not get paid, but if she turned in a timecard with more than 40 hours "it was a pain in the ass" and she would rather under-report her time "because you might get laid off if you stirred people up."  (Funk Deposition, 28:9-30:6).

going to pay them for it, or you're going to give them comp time for it . . ." (Johnson Deposition, pp. 226:20-227:3).[18]

• Due to pressure not to submit overtime and meet the demands of covering all of the news, Mr. Johnson's reporters "started fudging their time cards to make it add up to 40 hours a week. I showed Mel Gray . . . one time card . . ." on a Friday for a reporter who was to cover the Auburn football game that weekend but had already worked 36-38 hours. Mr. Johnson told Ms. Gray "it was absurd to think that he could drive from his house to Auburn, cover a four-hour game and do all of the blogging and writing and video that he did for a game and do it all in like three or four hours just so he can comply to a 40-hour work week." (Johnson Deposition, pp. 230:12-234:11).

• On April 29, 2008, Mr. Johnson sent an e-mail to Mel Gray complaining about adverse treatment he experienced because he was "one of the very few – who has the COURAGE to speak up in the face of injustices in our newsroom." (Johnson Deposition, Exhibit 14).

---

[18]    The Defendant would allow employees comp time in lieu of time and a half wage payments, but the Defendant did not allow Mr. Johnson's reporters to take the comp time because of the production schedule they were required to meet. (Johnson Deposition, pp. 240:4-241:18).

Mr. Johnson's statement included his complaints about overtime abuse by the Defendant.  (Johnson Deposition, 277:18-23).[19]

While Mr. Johnson first complained in 2007 that his reporters were working in excess of 40 hours week but under-reporting their time due to pressures not to submit overtime, he complained on multiple subsequent occasions (he estimated at least ten (10) times), including raising a complaint days before being placed on the PIP.  (Johnson Deposition, pp. 234:12-237:21,[20] 250:4-22;[21] 258:13-259:5;[22] 261:4-22;[23] 266:1-12[24]; 290:7-292:18[25]).

---

[19]    Within a month of this email, Ms. Gray disciplined Mr. Johnson for an alleged complaint from a co-worker.  (Johnson Deposition 282:4-284:11, Ex. 15).  Mr. Johnson disputes that Ms. Gray ever received such a complaint.  Ms. Gray refused to identify the alleged person who was offended, and when Mr. Johnson went to each employee with whom he worked to personally apologize for doing anything that might have been offensive, he was assured by each person that they were not the one who complained about him.  (Johnson Deposition 282:4-284:11).

[20]    Mr. Johnson's deposition testimony was that he complained his employees were not being allowed to use their comp time, and that they should either be paid overtime for the hours they worked or be allowed to take their comp time.

[21]    Mr. Johnson's deposition testimony was that he complained to Mel Gray that his employees were not writing down all of the hours that they worked.  When asked how she responded, Mr. Johnson testified, "Her response was, L.C. you can't do that.  Or a lot of times I could get from her and Wanda, oh, L.C. there you go again.  As though like they're tired of hearing this.  I'm like, well, yet you haven't done anything to help me remedy the situation.  And so ten times would not be a – would not be an overestimation of the times that I went to her and/or Wanda just pleading, begging for them to give me some kind of sensible solution to this staff shortage and hourly restrictions. . ."

[22]    Mr. Johnson testified, "I went to HR repeated times because they were working more hours than they were getting paid for . . ."

[23]    Mr. Johnson recalled that on multiple times starting in April or May of 2007 he discussed with Mel Gray and Wanda Lloyd that his reporters were working in excess of 40 hours a week, and "that you need to pay them for overtime during the peak season.  And that in short of that, you had to back off and let them have their comp time in the down time otherwise known

Even though the binding precedent Eleventh Circuit commands a finding that informal oral complaints constitute protected activity under the FLSA,[26] the Defendant argues that Mr. Johnson did not engage in protected activity because he did not submit a written complaint.[27]   The Defendant's argument conflicts not only with the binding precedent in this Circuit, but also the remedial purpose of the FLSA's anti-retaliation provision.   Protecting only written complaints elevates form over substance to the detriment of unwitting employees.   The Defendant's argument, taken to its logical conclusion, would mean that an employee who places a telephone call to her employer's human resources or payroll department asserting FLSA rights would not be protected from discharge or other retaliation, but the

_____

as the summer months," but that "their response was, no, you can't do that."

[24]     When asked in his deposition if he recalled complaining about the overtime issue between October 2007 and right before he was placed on his PIP, he testified that while he could not "give . . . specific dates, . . . it was an ongoing conversation.   And, again, after a certain point, it got to the point where I was going to Wanda and Mel; and they would kind of just roll their eyes, oh, L.C. there you go again.   And I was like, well, that's because you've never given me a viable solution.   And the problem doesn't go away just because you say no."

[25]     Mr. Johnson's testimony was that a few days after to going to HR, he was placed on the PIP.

[26]     The Eleventh Circuit does not stand alone on this issue.   In addition to the cases cited *supra* from the Fifth and Tenth Circuits, the Sixth and Eight Circuits hold that internal oral complaints are protected.   *See EEOC v. Romeo Community Schools*, 976 F. 2d 958 (6th Cir 1992); *Brennan v. Maxey's Yamaha*, 513 F.2d 179 (8th Cir. 1975).

[27]     Arguably, Mr. Johnson's April 29, 2008 email to Mel Gray satisfies the Defendant's argument that a complaint should be in writing since the email references his complaints of overtime abuse.   (Johnson Deposition, p. 277:18-23; Deposition Ex. 11).

employee who reduces his concerns to writing (even in an e-mail) would be protected.

Because it is much more likely that an employee will complain orally to his employer about improper wage or overtime compensation, the Defendant's interpretation would allow an employer a "window" to lawfully terminate the employee for her complaints before he employee reduces the complaint to writing. The Defendant's argument leaves vulnerable those employees who the FLSA seeks to protect; the employees with FLSA-related concerns who do not wish to "rock the boat" with the employer any more than necessary and who desire amicable resolutions of workplace disputes.

Applying the Rule 56 standard which requires that all reasonable inferences be drawn in favor of Mr. Johnson, he presented evidence satisfying the first elements of a prima facie case for retaliation under the FLSA because he presented evidence that on at least ten (10) occasions from the April/May 2007 through his termination in November 2008 he complained to the Defendant that it was engaging in acts that resulted in his reporters not being paid for overtime hours they worked.


2.     Mr. Johnson experienced adverse job actions.


20

The Eleventh Circuit held in *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998), that, as used in the context of a claim of retaliation under Title VII, adverse employment actions are not limited strictly to ultimate employment decisions such as a termination or a failure to promote. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) ("Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions."). In *Wideman*, the court found that a series of incidents involving reprimands and other negative treatment of an employee who had filed an EEOC charge could, when taken together, constitute adverse employment actions for the purposes of presenting a prima facie case of retaliation under Title VII. Id. Nevertheless, although actions falling short of ultimate decisions may still constitute adverse employment actions under Title VII, "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." *Wideman*, 141 at 1456; *see also Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

The Supreme Court held that the anti-retaliation provision of Title VII covers a broader scope of conduct than does the anti-discrimination provision. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) ("[W]e conclude that Title VII's substantive provision and its anti-retaliation provision are not coterminous. The scope of the

anti-retaliation provision extends beyond workplace-related or employment-related

retaliatory acts and harm."). The *Burlington Northern* standard for retaliation

applies to FLSA retaliation. *See Poole v. City of Plantation,* 2010 U.S. Dist.

LEXIS 44119, *66-67 (S.D. Fla. May 5, 2010) (citing *Metzler v. Federal Home*

*Loan Bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006) (extending

Burlington Northern to ADEA, ADA and FMLA claims)).

Mr. Johnson experienced adverse actions in the form of disciplinary actions,

a PIP, and ultimately his termination.  He presented evidence satisfying the second

element of a prima facie case of retaliation under the FLSA.

       3.    Mr. Johnson presented evidence that the Defendant's decision
            to terminate his employment was motivated by his complaints
            of the Defendant's overtime practices.

"The causal link element is construed broadly so that 'a plaintiff merely has

to prove that the protected activity and the negative employment action are not

completely unrelated.'"  *Walton v. Neptune Tech. Group, Inc.*, 2009 U.S. Dist.

LEXIS 97213, * 47-48 (M.D. Ala. Oct. 20, 2009) (quoting *Pennington v. City of*

*Huntsville*, 261 F.3d 1262 (11th Cir. 2001)).[28]  "One common method of

---

[28]    The Defendant emphasizes that the standard for retaliation is a "but for" standard.
In doing so, the Defendant does not expressly state that it is arguing for a "sole cause" standard,
but to the extent the Defendant is raising such an argument, its analysis is flawed.  As this Court
recently noted in *Freeman v. Koch Foods of Ala.*, 2010 U.S. Dist. LEXIS 59502, *4-5 (M.D.
Ala. June 15, 2010):

establishing the causal link element is close temporal proximity between the adverse employment action and the protected activity. Of course, this is not the sole means of establishing the causal link element; rather it is merely the most commonly used approach." *See Walton*, 2009 U.S. Dist. LEXIS 98213 at *48 (observing that a period of three months between a protected act and the events resulting in an employee's termination is sufficient circumstantial evidence to satisfy the requirement that the employee have evidence of all the elements of the prima facie case of retaliation).[29]

---

A sole-causation standard (which requires a plaintiff to prove that the defendant's consideration of a protected category is the only cause of a challenged employment decision) is not the same as a but-for, or necessary, causation standard (which requires a plaintiff to prove that a challenged employment decision would not have occurred but for the defendant's consideration of a protected category). *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n.10, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976) (distinguishing sole causation from but-for causation); Michael C. Harper, *The Causation Standard in Federal Employment Law: Gross v. FBL Financial Services, Inc., and the Unfulfilled Promise of the Civil Rights Act of 1991*, 58 Buff. L. Rev. 69, 75 (2010) (explaining the difference between various types of employment-discrimination causation standards. Even though a sole cause is also a necessary cause, a necessary cause need not be a sole cause. Rather, a particular result may have two or more necessary causes, and the majority opinion in *Gross* does not hold otherwise.

[29]     Noting that the causation element simply requires evidence from which an inference of an unlawful motive can be derived, in *Hunter v. Mobis Ala., LLC*, 559 F. Supp. 2d 1247, 1257 (M.D. Ala. 2008), a court within this jurisdiction found evidence of co-worker concern that an employer would discriminate against an employee upon learning of her pregnancy could be circumstantial evidence to permit this type of inference.  The court wrote:

Second, there is the testimony of Womack, Hunter's supervisor, that "I had heard -- I don't know specifically, but I just kind of heard, like, rumors or whatever that other people had been -- and I'm not saying it was because of being pregnant, but it just so happened the person was pregnant." (Depo. Womack 21:14-19.) There is Hunter's testimony that, upon informing Womack of her pregnancy, that Womack

Mr. Johnson presented evidence that he complained on multiple occasions starting in April/May 2007 and continued to do so through the conclusion of his employment.  Within days of raising those complaints he experienced adverse actions in the form of disciplinary actions, a PIP, and a termination.  This evidence is sufficient under the Rule 56 standard to allow a jury to conclude that the Defendant, weary and angry from Mr. Johnson's repeated complaints, terminated him.

The Defendant ignores the pattern of ongoing complaints by Mr. Johnson and instead argues that because there was a period of a year between Mr. Johnson's initial complaint and his termination, there is no inference of retaliation.  The Defendant's argument ignores the cumulative effect of Mr. Johnson's complaints.  In examining an almost identical argument, a trial court in the United States District Court for the Northern District of Alabama, highlighted the legal error inherent in the Defendant's contention:

---

had told her, "[D]o not tell Jay Kim . . . [b]ecause of a previous employee that was fired in regards to being pregnant." (Hunter Depo. 96:7-11), and that other employees had also told her not to tell (Hunter Depo. 97:15-16). All of these comments permit an inference of a discriminatory animus, and thus constitute circumstantial evidence that her termination was based on such bias.

Mr. Johnson presented evidence that his reporters, as well as Hillary Funk, feared punishment/termination for reporting overtime they worked.  This permits an inference of retaliatory animus, and thus constitutes circumstantial evidence that Mr. Johnson's termination was based on such bias.

Media General argues that the temporal nexus is too attenuated to support an inference of retaliation in Kelly's discharge. Kelly's original complaints were made to her supervisors . . . in October 2001. Media General sees the nearly three year period between these complaints and her June 2004 termination as too distant, and cites a number of cases to support such a finding . . . If that was the only factual circumstance, Kelly would almost certainly fail to make out even a *prima facie* case.  However, Media General in its original brief leaves out numerous other protected activities undertaken by Kelly over the course of her time at WIAT. Kelly filed her original EEOC charge on April 29, 2003, and amended that charge to state a claim of harassment on June 26, 2003. Kelly also complained to Partenheimer via email about discrimination and harassment on June 26, 2003. Kelly was terminated on July 1, 2003, just four days later. The four day difference between the complaint, the amended EEOC claim, and Kelly's termination is more than close enough temporally to support a *prima facie* case.

Media General suggests that if it had wanted to retaliate against Kelly for her complaints of discrimination it could have done so long before it ultimately terminated her in 2003. This argument fails to account for all the subsequent protected activity. **It is not hard to imagine that Kelly's EEOC complaint, or her amended complaint, or her complaints to Partenheimer, were the proverbial straws that broke the retaliatory camel's back. To assume that the nature and severity of the complaints was necessarily unchanging over the course of the years such that Media General's motivation to retaliate was also unchanging seems a remarkably silly argument. Clearly, Media General wants the court to ignore all of this subsequent protected activity, or at least lump it all together and date it back to 2001. This court is not prepared to do that on a motion for summary judgment.**  A jury may be more accommodating.

*Kelly v. Media General,* 03-AR-2557-S, pp. 21-22 (emphasis added) (a copy

is attached hereto as Exhibit A).

25

Because the Defendant's argument ignores the cumulative effect of all of Mr. Johnson's complaints, and Mr. Johnson produced evidence that shortly after raising his complaints he experienced actions which led to his termination, a reasonable jury could find that Mr. Johnson established a prima face case of retaliation under the FLSA.

B.      Mr. Johnson presented evidence of pretext.

A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *McNorton v. Ga. DOT*, 619 F. Supp. 2d 1360, 1379 (N.D. Ga. 2007).  In order to show pretext:

> . . . the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case . . . Evidence already introduced to establish the prima facie case may be considered, and "[i]ndeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation" and establish pretext.

*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

Wanda Lloyd testified that her November 21, 2008 Interoffice Memorandum contained all of the reasons for Mr. Johnson's termination.  The memo identified the following reasons:

- Mr. Johnson allegedly misused a company credit card;

- One of Mr. Johnson's reporters did not do a story on a family member of an Olympic athlete from the Prattville area;

- On September 4, 2008, the Defendant placed Mr. Johnson on a PIP identifying the following areas for improvement: planning, coverage of other sporting events, communication, following company policy, and inappropriate displays of behavior;[30]

- While his "weekly meetings showed progress in most areas," on October 29 he failed to attend a Zenger-Miller class;

- He failed to have required meetings;

- He failed to manage his reporters' vacation schedule;

---

[30]     The vague nature of this item suggests pretext because it runs contrary to the Supreme Court's requirement that the Defendant's articulation be clear and specific, and not vague. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 109 (1st Cir. 1988); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 5 (1st Cir. 1979). The fact that Defendant did not offer a definite, specific examples for this reason for termination suggests that its decision was not guided by legitimate, nondiscriminatory motives. *See* M. Player, *Employment Discrimination Law* at 335 (1988) (on of the reasons for *Burdine*'s "clear and reasonably specific" requirement is that "[v]agueness ... suggests the absence of any bona fide reason and the possibility of an underlying improper motivation").

"When an employer's reason for the action complained of has been shown to be idiosyncratic, unreasonable or riddled with error and where demeanor evidence and vagueness indicated that a pretext is involved, a factfinder may conclude ... that the alleged reasons are not the true rationale behind the action." *Allen v. City of Yonkers*, 803 F.Supp 679, 708 (S.D.N.Y. 1992), *citing to Dister v. The Continental Group*, 859 F.2d 1108, 1116 (2d. Cir. 1988), *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979), *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1564 (11th Cir. 1987).

- On November 18 he was given a final written warning concerning poor customer service after a reader complained about the lack of coverage of Florida sports;

- His planning for the SEC Championship and Bowl issues of Game Day was "not happening in an efficient manner."

(Johnson Deposition Ex. 23).

In analyzing the Defendant's arguments, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (*quoting Cooper-Houston v. So. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).[31]

---

[31]    Although this Circuit has established as a general rule that when a defendant offers multiple nondiscriminatory reasons for making an employment decision, a plaintiff must offer evidence to refute each of the reasons to withstand judgment as a matter of law, *see Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (where plaintiff failed to rebut one of the three reasons, defendant was entitled to judgment as a matter of law on charge of impermissible discrimination); *Chapman*, 229 F.3d at 1037  ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence f or a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual."), the Eleventh Circuit has left open the question of whether an exception to that general rule might exist in certain cases.

The dissent in *Chapman* opined that judgment as a matter of law would be inappropriate even if a plaintiff successfully presents evidence of pretext as to some, but not all, of the employer's stated nondiscriminatory reasons if: (1) the nondiscriminatory reasons are so intertwined such that a showing of pretext as to one of the reasons is sufficiently strong to allow a factfinder to conclude that the employer lacks all credibility; (2) there are a large number of

In this case, a jury could find pretext in that the evidence suggests that the Defendant was attempting to make a case to terminate Mr. Johnson for his ongoing complaints on overtime issues for his staff.  An employer's actions of building a case against an employee is evidence of retaliation.  *See Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, (11th Cir. 1991); *Sheridan v. E.I DuPont de Nemours and Co.*, 100 F.3d 1061, 1074 (3rd Cir. 1996); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107 (8th Cir. 2000).

---

reasons proffered; or (3) the employer has offered both an objective and a subjective reason and the objective one is shown to be pretextual. *Chapman*, 229 F.3d at 1050-51 (Birch, J., dissenting).  Although the Chapman majority rejected that such an exception was appropriate under the facts in Chapman, it "express[ed] no view on whether [an] exception might exist in some case with different facts." *Chapman*, 229 F.3d at 1037, n. 30.  The recognition that such an exception should be applied in certain cases would be consistent with the Eleventh Circuit Pattern Jury Instructions:

> if the evidence of pretext  as to some of the employer's proffered explanations is strong enough to allow a factfinder to conclude that the employer lacks all credibility, the plaintiff should be able to survive [judgment as a matter of law because] . . . . This is consistent with common sense and with the Eleventh Circuit's standard pattern jury instructions for civil cases, which instruct jurors that: "You should decide whether you believe what each witness had to say … [and,] … in making that decision, you may believe or disbelieve any witness, in whole or in part."

*Alexander v. Chattahoochee Valley Cmty Coll.*, 325 F. Supp. 2d 1274, 1292 n.31 (M.D. Ala. 2004) (quoting Eleventh Circuit Pattern Jury Instructions (Civil Cases), Basic Instructions 3).

The *Alexander* analysis rings true.  It is illogical to hold a Plaintiff to a higher standard at the Rule 56 stage than the finder of fact is to apply in evaluating the evidence at trial.   This case falls within the type of situations anticipated by the *Chapman* exceptions.  It involves a large number of proffered reasons which are intertwined with one another and are, in part, subjective in nature.

1.    Mr. Johnson presented evidence that his performance did not
      warrant his termination, thereby suggesting pretext.

Of the eight reasons identified in the November 21 termination memo, the

vast majority of the reasons relate to planning and scheduling.[32]  However, the

work product generated by Mr. Johnson calls into question the legitimacy of the

Defendant's alleged concerns with his planning skills.  Mr. Johnson's performance

earned him MBO bonuses as well as the Making the Difference award.  His three

(3) performance evaluations performed by someone who would not have been the

subject of his FLSA complaints noted:   (1) an improving trend in his performance,

(2) commendable ratings, (3) that under "[Mr. Johnson's guidance], the sports staff

stayed abreast of breaking developments and provided readers with well-rounded

coverage on both the high school and collegiate levels," (4) "L.C. has done a good

job of providing daily budgets," and (5) "L.C. has done a good job of directing his

staff this past year - holding meetings, making assignments, coordinating coverage

of events. " (Johnson Deposition, Exhibits 7, 9, 11).  The very areas for which Ms.

---

[32]      The timing of the PIP and its requirements that Mr. Johnson have multiple
meetings his managing editor, and his staff is of consequence.  The Defendant does not dispute
that football season is the sports department's busiest time of the year.  The evidence shows that
Mr. Johnson had made the Defendant aware on multiple occasions that he was woefully
understaffed, and that his employees were having to work in excess of 40 hours a week to cover
their stories.  Mr. Johnson also noted that the 2008 football season was unusually busy due to
Alabama State being under NCAA investigation, Alabama having a perfect season and pursing a
SEC/National title, and Auburn preparing to terminate its head coach.  The Defendant created
requirements through the PIP during this admitted hectic time which it had reason to believe Mr.
Johnson would difficult, if not impossible, to meet.  A jury could find that the Defendant was
placing Mr. Johnson in the no-win position of having to choose between completing his work
and attending meetings.

Lloyd criticized Mr. Johnson were found to be "Satisfactory" or "Very Good" on his performance evaluations.

Furthermore, the evidence demonstrates that Mr. Johnson was told he was improving during the PIP. This evidence, combined with the changes (reduced coverage areas) to the Sports Editor's job for Mr. Johnson's successor would allow a jury to find that the Defendant's stated reason for terminating Mr. Johnson, poor planning/failure to hold meetings is a pretext.

2.      Mr. Johnson's evidence refuting each of the reasons articulated by the Defendant suggests pretext.

a.      The Defendant's use of the June 18, 2008 communication relating to an unpaid balance on Mr. Johnson's credit card suggests pretext.

The Defendant permitted its editors, like Mr. Johnson, the use of a credit card for expenses such as food and gas. (Johnson Deposition 285: 2- 287:4). The Defendant wanted the balance to be paid in full each month by the editor,[33] but Mr. Johnson was not aware of this preference. (Id.).[34] Mr. Johnson had been making

---

[33]      The Defendant was not responsible for paying the credit card bill. The responsibility for payment always remained with the employee. (Lloyd Deposition 72:3-9).

[34]      The Defendant asserts in its summary judgment motion that the alleged policy violation relating to the credit card was that Mr. Johnson may have used the credit card for groceries or gas. However, this is not the alleged violation identified by Ms. Lloyd. She testified:

Q:      And what did Mr. Johnson do that constituted a violation of the credit card policy?

monthly payments toward his balance, but had not been paying the balance in full. (Id.). Ms. Lloyd called Mr. Johnson while he was on vacation and asked him to take care of the outstanding balance, which he did immediately before returning from vacation. (Id.).[35] At all times, the card remained in good standing with the credit card company. (Id.). The phone call to Mr. Johnson while he was on vacation is what the Defendant classified as a "verbal warning" on June 18 supporting his termination.

The Defendant's use of a June conversation in which Ms. Lloyd asked Mr. Johnson to pay an outstanding balance on a credit card, to which he immediately responded, to justify his termination at the end of November suggests pretext because of the trivial nature of the alleged infraction. *See Dinkins v. Varsity Contrs., Inc.,* 2005 U.S. Dist. LEXIS 6732, *39-42 (N.D. Ill. 2005) (finding pretext and accepting employee's argument that terminating him for failing to sign a

---

A:     He – based on information I got from our accounting department, he charged – le me – based on information I got from our accounting department, he did not pay the bill in full and that there was a large balance that was carried over more than thirty days.

Based on a conversation I had with Mr. Johnson, however, he used it for gas, grocery store, other things. I think that was a conversation I had with him. But we did confirm that there were some charges made during the time when he was not traveling.

(Lloyd Deposition 71:7-21).

[35]     While Ms. Lloyd maintains there were several conversations about the balance, Mr. Johnson contains that there was only this one conversation. (Johnson Deposition 286:15-17). Applying the Rule 56 standard, this dispute should be resolved in favor of Mr. Johnson for purposes of summary judgment.

company document was a "flimsy reason" for termination); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285 (7th Cir. 1999) (rejecting employer argument that an employee was discharged for theft when he took potato chips from a bag that appeared to be abandoned in the lunchroom when the person whose chips were taken said "it was no big deal"); *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976 (7th Cir. 2000) (concluding that an employee's breach of personnel policy by helping an employee on break in the restroom fix a fingernail to trivial to justify firing); *Byrd v. Lakeshore Hospital*, 30 F.3d 1380, 1383 n.5 (11th Cir. 1994) (observing that an employer does not meet its burden of establishing a non-discriminatory reason by relying on conduct which could be permitted by the employer's practices).

The use of Ms. Lloyd's request to Mr. Johnson to pay an outstanding credit card balance to justify his termination suggests pretext because it is evidence from which a reasonable jury could find that it is an effort by the Defendant to "pile on" to make a case to terminate Mr. Johnson and conceal its retaliatory motive.

        b.    The Defendant's use of a reporter's refusal to follow Mr. Johnson's direction relating to Olympic coverage suggests pretext.

In August 2008, prior to the Defendant placing Mr. Johnson on a PIP,[36] Mr. Johnson assigned one of his reporters, Jay G. Tate to contact the mother/grandmother of Tyson Gay to cover Mr. Gay's participation in the Olympics. (Johnson Deposition 287: 14-289:9). Mr. Tate represented to Mr. Johnson that he attempted to contact the athlete's mother/ grandmother through reasonable means, but she never returned his call. (Id.).[37] Mr. Johnson believed him and shared this information with Mel Gray. (Id.). When asked to evidence why the use of this incident to justify his termination was a pretext, Mr. Johnson testified that "as far as the Olympic coverage stories; again, had they given me the

---

[36]     The Defendant's use of this circumstance which pre-dated his PIP is further example of its efforts to build a case to terminate Mr. Johnson to conceal its retaliatory motive. Mr. Johnson testified in his deposition that this situation was an example of the Defendant "looking for a reason to pile on . . ." (Johnson Deposition 289:3-6).

[37]     Wanda Lloyd conceded in her deposition when asked to confirm Mr. Johnson had directed a reporter to do the story, but the report did not deliver, "that may be true. I don't – I know I've read through so much here, and that may be true." (Lloyd Deposition 63:4-12). Ms. Lloyd also conceded that this coverage coincided with football coverage:

Q:      And the Olympics were happening when?

A:      During the summer of '08, I believe.

Q:      Specifically August, correct?

A:      Probably.

Q:      What else was going on in August in sports?

A:      Football.

(Lloyd Deposition 64:20-65:3).

proper resources for which to do the things I was asked to do, I would have done

it." (Johnson Deposition 393:5-12).

The Defendant's use of the Tyson Gay situation suggest pretext because the

Defendant used a situation where Mr. Johnson did what he was supposed to do and

directed a reporter to cover a story, but then punished Mr. Johnson for the

reporter's failure to deliver when the Defendant knew Mr. Johnson was short

staffed and that his reporters were unable to complete coverage of their beats

within an approved 40 hour work week. A jury could find that this is another

situation of the Defendant attempting to build a case to conceal its retaliatory

motive.

          c.     The Defendant's use of the PIP to terminate Mr. Johnson
               suggests pretext.

The Defendant stated in the termination memo to Mr. Johnson that one of

the reasons it terminated him was that on September 4, 2008, he was placed on a

PIP identifying the following areas for improvement: planning, coverage of other

sporting events, communication, following company policy, and inappropriate

displays of behavior. The memo does not specifically identify any specific

examples or conduct relating to this reason. As noted above, Mr. Johnson's

evaluations from Mr. Maitland call into question the truth of whether Mr.

Johnson's planning, coverage of events, communication, adherence to policy and behavior were anything less than satisfactory to the Defendant.

When asked to explain why this reason was pretextual, Mr. Johnson testified that "the perform improvement plan, I thought it was a face from start to finish; and I told Mel Gray that I thought it was a farce and it was hard to make is serious with regard to the shoddy way with which they presented it to me and the way with which they allegedly tried to help me improve the areas that they outlined." (Johnson Deposition 393:15-22).

The Defendant regularly and consistently told Mr. Johnson in the weeks leading up to his termination that he was improving.  From the evidence a jury could find that the Defendant's decision to terminate Mr. Johnson was independent of the PIP; that the Defendant's true reason for terminating Mr. Johnson was retaliation.

> d.   The Defendant's reliance on Mr. Johnson's absence at an October 29 Zenger-Miller leadership class suggests pretext.

Mr. Johnson explained that the use of one absence at Zenger-Miller training session was pretextual in his deposition.[38]  "The Zenger-Miller meetings referenced

---

[38]   Interestingly, the Defendant does not mention that at one of the Zenger-Miller classes, when the issue of FLSA exemption was discussed, Mr. Johnson raised the issue about the Defendant's efforts to avoid paying overtime resulted in him having to do substantially more work which had previously done by non-exempt employees.  (Johnson Deposition 244:11-

here, this was also a joke because I was one of the most active members of Zenger

Moore class . . . I was a big fan of that class." (Johnson Deposition 293:23-

394:12). He noted that "when I missed class, failed to attend a scheduled class for

Zenger-Miller. Well, that's because I had to do the job that otherwise would have

been done by one of our reporters after they foolishly scheduled a mandatory

meeting that required all five of my writers to be at a meeting at the same time in

the middle of the afternoon in the middle of football season. So I was out working

covering one of my writers' jobs instead of Zenger-Miller." (Johnson Deposition

394:12-394:22).

Moreover, when Mr. Johnson was an Assistant Sports Editor for the

Defendant, prior to him complaining of FLSA violations, the Defendant "said,

okay, during the heart of football season, Wednesday is a huge production day for

Game Day. And, therefore, it would be inconceivable and just completely

unreasonable to expect L.C. to devote four or five hours, whatever that class

entailed, out of his busiest day of the work week to attend the class." (Johnson

Deposition 394:23-395:11).

Because the absence identified by the Defendant was due to the Defendant's

scheduling or Mr. Johnson's reporters for a meeting and the Defendant's prior

acknowledgment that Mr. Johnson would not be expected to attend Zenger-Miller

---

246:9).

training when the demands of the sports department took priority, the Defendant's use of this absence suggests pretext.

     e.     The Defendant's argument that it terminated Mr. Johnson because he failed to attend meetings suggests pretext.

Mr. Johnson noted that despite his efforts to schedule monthly meetings with the Local Editor, Gary Maitland, but they did not occur because he was at the mercy of Mr. Maitland's schedule.  (Johnson Deposition 216:8-21).[39]  Mr. Johnson also took proactive steps to confer with his Managing Editor (Mel Gray) about coverage plans and schedules.  When asked in her deposition what meetings Mr. Johnson failed to attend, Ms. Gray testified:

Q:     What meetings did he fail to attend?

A:     He often did not show up for the afternoon budget meetings. The missed team leader meetings.  There were occasions that he missed training sessions that he had been reminded of for manager, specifically the Zenger Miller training.  There were several – I can't say several.  There were modules that – session that he missed on that.

. . .

---

[39]     Mr. Johnson initiated at least one meeting with this editor because Mr. Johnson only had five (5) reporters who were responsible for covering 7 colleges and 40 high schools in addition to youth and rec sports, women's sports and the Navistar golf tournament.  (Johnson Deposition 217:14-219:6;  224:16-225:16).  When Ms. Gray and Ms. Lloyd declined Mr. Johnson's request to assign a stringer to cover the Navistar tournament in Prattville at the cost of $35, Mr. Johnson talked to the local section editor about assigning a reporter to cover the event because Mr. Johnson did not have enough staff to cover the event.  (Johnson Deposition 217:14-219:6).

Q:     How many afternoon budget meetings did he fail to attend?

A:     I don't recall

(Gray Deposition 159:10-160:4)

When given a chance to review the documents produced by the Defendant in this action and pressed to identify any date on which Mr. Johnson missed a budget meeting, Ms. Gray was unable to identify even one date or document showing Mr. Johnson missed a budget meeting.  (Gray Deposition 163:7-164:20).[40]  Ms. Gray conceded there is no documentation showing a specific budget meeting Mr. Johnson missed.  (Gray Deposition 164:17-20).  When asked to identify how many

---

[40]    Similarly, Wanda Lloyd was unable to provide details on missed meetings.  She testified:

Q:     Well, tell me everything you know about Mr. Johnson's failure to establish monthly meetings with his team and managing editor.

A:     I don't' know anything specifically other than the fact that we asked him to have monthly meetings with his staff, and he was not doing it.  And we asked him to have meetings with the managing editor.  He was not meeting with the managing editor.

Q:     Do you know if he attempted to have meetings with the managing editor?

A:     I do not know.

Q:     But she did not make time for him?

A:     I do not know that.

Q:     Is that something that you investigated before making the decision to terminate Mr. Johnson?

A:     I did not investigate it . . .

(Lloyd Deposition 94:5-22).

team leader meetings Mr. Johnson missed, Ms. Gray could not quantify Mr. Johnson's absences or identify a date of any missed meeting (165:3-166:18).[41]  The utter lack of detail and documentation for these absences that were allegedly so crucial to the Defendant that they warranted Mr. Johnson's termination suggests pretext.  *Wascura v. City of S. Miami*, 257 F.3d 1238,1245 (11th Cir. 2001); *Stanfield v. Answering Serv., Inc.*, 867 F.2d 1290, 1294 (11th Cir. 1989); *Everett v. Lake Martin Area United Way*, 46 F. Supp. 2d 1233, 1237 (M.D. Ala. 1999).

Mr. Johnson presented evidence that he indeed complied with his meeting requirements.  He recalled meeting on a weekly basis with Ms. Gray relating to his PIP, but that she would never meet with him for more than ten (10) minutes. (Doc. 1 - Verified Complaint, ¶ 22) and were not productive because they did not involve any tangible strategies he could use to resolve to improve the department.  (Johnson Deposition 395:17-23).  Ms. Gray's comments in the meetings consisted of "you did a better job this week," without offering any constructive advice or suggestions.  (Id.; Johnson Deposition 298: 1-8).  His performance evaluation in 2008 documented he did a favorable job of directing his staff by holding meetings with them.  (Johnson Deposition, Exhibit 11 - March 10, 2008 Evaluation).

---

[41]      She conceded that any absences at team leader meetings on Mr. Johnson's part could have been the result of him being on leave.  (Gray Deposition 166:3-10).

The Defendant's reliance on vague and unsupported allegations of missed meetings, in light of the evidence that Mr. Johnson had these meetings, suggests pretext rendering summary judgment improper.

                f.     The Defendant's allegation that it terminated Mr. Johnson for failing to manage his reporters' vacation schedule is pretextual.

As discussed *supra*, Mr. Johnson attempted to manage his reporters vacation schedule by going to the Defendant when the Defendant refused to allow the reporters to take vacation/comp time during the summer.  As discussed *supra,* Mr. Johnson apprised the Defendant of his need for its permission to allow his employees to be off from work, but was denied permission to give them leave When asked about this Ms. Lloyd's memory was foggy but she ultimately conceded that Mr. Johnson had been proactive in attempting to schedule his employee's vacation prior the sports department's busy season:

> Q:    Isn't it true, though, that during the summer of 2008, Mr. Johnson came to both you and Ms. Gray repeatedly requesting to allow his reporters to use comp time prior to the beginning of the very busy football season?
> . . .

A:     Company policy says we do not have comp time except during the week of the need for comp time.

Q:     Let me rephrase the question, then.  Isn't it true in the summer, Mr. Johnson came to you about allowing his reporters to use their vacation time during those months before fall got into full swing?

A:     I don't remember any specific conversations about that.

Q:     Do you remember any general conversations?

A:     I remember hearing that he said that, and I don't' recall whether he said it specifically to me or to Ms. Gray.

Q:     Isn't it true that Mr. Johnson was trying to express to you and Ms. Gray that his reporters, because of how busy fall is due to football, needed to use their vacation time prior that point and was trying to plan accordingly?

A:     I remember telling him that – which summer is this, summer of –

Q:     '08.

A:     I don't remember specifically.

Q:     When you wrote that you have not properly managed your reporters' vacation schedule, what did you reference?  What were you referencing?

A:     I was referencing the fact that reporters were – reporters' vacation was not on the vacation schedule that we maintain in the department and that they hadn't taken their vacation.

We track vacation.  So we can tell at any given time if somebody is close to losing their vacation for the year.

Q:    And you can't remember whether or not Mr. Johnson came to
      you about that very issue in the summer of 2008?

A:    I don't recall that it was the summer of 2008, and I don't' recall
      whether he came directly to me or if I heard it from Ms. Gray.
. . . .

Q:    Would it be fair to say you have some recollection of Mr.
      Johnson having a conversation with someone about a concern
      about his employees using their vacation time?

A:    Yes.

(Lloyd Deposition 97:11-100:7).

The evidence demonstrates that Mr. Johnson attempted to schedule his

reporters time off prior to the department's busy season, and discussed those

efforts with the Defendant, but the Defendant refused the time off.  A jury

could find pretext in the Defendant's use of a condition it created (the refusal

to allow employees vacation/comp time) and to which Mr. Johnson objected

on behalf of the employees to justify his termination.


            g.    The Defendant's use of November 18 reader
                  complaint that Mr. Johnson was not covering Florida
                  sports suggest pretext.

To say that the direction the Defendant gave Mr. Johnson and his reporters

on coverage priorities was confusing and inconsistent would be kind.  The

Defendant regularly and repeatedly changed its coverage priorities, often providing

inconsistent direction.  Hillary Funk, a reporter outside of the sports section, recalled meetings where Mel Gray would emphasize covering one area, "and then, you know, the next meeting I would have with all the editors up to Mel, the focus would be entirely different."  (Funk Deposition 52:21-53:16).  This constant change amounted to "sea sickness."  (Id. at 53:16-54:1).  For this reason, most, if not all, criticisms the Defendant may have of prioritization given to coverage would directly attributable to the direction it offered.

With respect to the incident relating to covering Florida sports, the Defendant decided "to put a greater emphasis on local news."  (Gray Deposition 63:21-23).  Mr. Johnson recalled with respect to this situation that a gentleman complained that the paper was "not having enough University of Florida coverage."  (Johnson Deposition 325:4-21).  Mr. Johnson continued:

> And so I said, well, you know, you do realize that we're the Montgomery Advertiser.  And as somebody who spent ten years living in Florida and worked for papers down there, I can assure you there's no coverage down there that's like pumping up the Alabama and Auburn coverage.  So therefore, you know, it would be unreasonable for you to expect us to have, you know, blanket Florida coverage in an Alabama newspaper.  And, you know, he wasn't okay with that and this and that . . That was the gist of the conversations . . . Like I had said . . . my space allotment had been, you know, dwindling down every – every day to the point where I couldn't' get all of our stuff in the paper . . .

(Johnson Deposition 325:22-326:21).

A jury could find that the Defendant's use of a complaint that Mr. Johnson was not devoting sufficient coverage to the University of Florida in light of the Defendant's emphasis on prioritizing local coverage to be a pretext.

>    h.    The Defendant ignored that Mr. Johnson had an effective plan in place for coverage of the SEC Championship and bowl games.

The Defendant's assertion that at the time of his termination Mr. Johnson did not have a plan in place to cover the SEC Championship and bowl games is untrue and suggests pretext.  Mr. Johnson recalled:

> The SEC championship/bowl game issue that they reference here, as I said before, I had had a detailed plan in hand the day they fired me. And had Wanda Lloyd or Mel Gray had the sense to check my E-mail or ask me about it before handing me this shoddy letter; they would have seen that I had already done the job that they accused me of not being able to fulfill.

(Johnson Deposition 396:1-9).

On the day of his termination, Mr. Johnson had a meeting scheduled in the afternoon with Ms. Gray where they were to review Iron Bowl and bowl coverage. (Johnson Deposition 310:13-23).  Her recalled:

> Like I said, I was supposed to meet that day with Mel to outline the whole coverage – the week's coverage.  So – so if she meant instead of the bowl instead of – if she meant Iron Bowl instead of the bowls, she still would be wrong because I had preset up a meeting with Mel Gray to discuss the bowls that day.  And on top of that, guess what plan they used in the bowl coverage; the very ones I submitted to Mel

Gray the day they fired me.  Because I had E-mailed her because it was in advance of the meeting that she and I were supposed to have in her office.  So to say that I didn't do it was false . . . And I sent her an E-mail outlining the whole plan for all of the Iron Bowl coverage. And she acknowledge receipt of it and said, wait a second, L.C., I've got to go.  I'll be right back.  And I never saw her again because I was shortly thereafter called down to HR and was let go.

(Johnson Deposition 332:21-334:6).

Mr. Johnson held staff meetings with his staff to discuss SEC Championship and bowl issues of Game Day but needed Ms. Gray's approval on the finer points of his plan.  (Johnson Deposition 334:12-336:8).[42]  Because Mr. Johnson had created plans for the Iron Bowl, SEC Championship and bowl games, a jury could find pretext in the Defendant's assertion that his lack of planning for such motivated his termination.  *See  Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1345-1346 (11th Cir. 2000) (a Plaintiff's denial of a concrete fact suggest pretext).

## CONCLUSION

The Defendant's summary judgment motion is due to be denied.  Mr. Johnson presented evidence that he repeatedly complained to the Defendant that its scheduling practices resulted in his reporters working hours for which they were not paid, the Defendant did not receive his complaints favorably, and that the

---

[42]     Reporter Jay G. Tate missed this meeting.  (Johnson Deposition 334:12-336:8). Feeling left out of the loop, Mr. Tate voiced his feelings, and "he didnt' say it that nicely." (Johnson Deposition 336:23-337:6).

Defendant in response to those complaints attempted to fabricate a case to terminate him.

Respectfully submitted,

/s/ *Heather Newsom Leonard*
COUNSEL FOR PLAINTIFFS
HEATHER LEONARD, P.C.
P.O. Box 43768
3180-A Cahaba Heights Road
Birmingham, Alabama 35243
(205) 977-5421
(205) 278-1400 facsimile
Heather@HeatherLeonardPC.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification of the filing to the following, on July 15, 2010:

> Lynlee Wells Palmer
> Anita Kay Head
> JOHNSTON BARTON PROCTOR & ROSE, LLP
> Colonial Brookwood Center
> 569 Brookwood Village, Suite 901
> Birmingham, AL 35209

> *Heather Newsom Leonard*
> OF COUNSEL